**DARIN & ARMSTRONG, INC., Plaintiff,**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, REGION V, et al., Defendants.**

United States District Court,
N. D. Ohio, E. D.

June 24, 1976.

William D. Ginn, Michael A. Cyphert, Thompson, Hine & Flory, Cleveland, Ohio, for plaintiff.

Joseph A. Cipollone, Asst. U.S. Atty., Lucian C. Rego, James W. Sanders, Cleveland, Ohio, A. Henry Gaede, Jr., E. Mabry Rogers, Birmingham, Ala., Thomas P. Mulligan, Richard W. Avery, Cleveland, Ohio, Bradley, Arant, Rose & White, Birmingham, Ala., Jones, Day, Reavis & Pogue, Cleveland, Ohio, for defendants.

MEMORANDUM AND OPINION

MANOS, District Judge.

On May 20, 1976 the plaintiff, Darin & Armstrong, Inc. [hereinafter Darin], initiated this action under 5 U.S.C. §§ 701–706 to obtain judicial review of a final order[1] issued by the Regional Administrator of the United States Environmental Protection Agency, Region V [hereinafter EPA] concerning a bid protest prosecuted by defendant Blount Brothers, Incorporated [hereinafter Blount],[2] and to enjoin the Cleveland Regional Sewer District [hereinafter CRSD] from implementing the EPA's ruling. At the same time that Darin filed the complaint it moved the court for a temporary restraining order and a preliminary injunction enjoining the CRSD from implementing the EPA's ruling. The court granted Darin's motion for a temporary restraining order on May 20, 1975, pursuant to Fed.R. Civ.P. 65(b).[3] On May 28, 1976 the court ordered a consolidation of the merits of Darin's appeal with Darin's request for a preliminary injunction, and the court extended the temporary restraining order to permit the parties to submit briefs on the merits of the appeal.[4] After all the briefs were filed, Darin and the CRSD stipulated to an extension of the temporary restraining order.[5]

1. See 40 C.F.R. § 35.939(e)(3) (Fed.Reg., December 17, 1975); *Admin. Record*, Tab 22.

2. Blount's appeal was prosecuted pursuant to 40 C.F.R. § 35.939(b), (e) (Fed.Reg., December 17, 1975).

3. The original temporary restraining order was designated to expire ten days after it was signed.

4. See Fed.R.Civ.P. 65(b). The order extending the temporary restraining order was scheduled to expire on June 9, 1975.

5. According to this stipulation, the temporary restraining order remains in force until June 21, 1975.

6. The parties have informed the court of the urgency of a prompt conclusion of this litigation. CRSD received this grant in May, 1975 and it must initiate construction by early November, 1976 or it will lose the grant pursuant to 40 C.F.R. § 35.935–9 which provides:

## I.

### FACTUAL BACKGROUND

On May 12, 1975 the EPA awarded a construction grant, denominated EPA Project No. C390051–02, to the CRSD under 33 U.S.C. § 1251, *et seq.*, for 75% of the cost of a proposed wastewater treatment facility for the west side of Cleveland. The estimated cost of the total project was $87,000,-000 of which EPA would pay $65,000,000, provided that CRSD's procurement procedure met the requirements of 40 C.F.R. § 35.936, *et seq.*, and that the construction of the project commenced within a year and a half from the date of the grant.[6]

After receiving the grant the CRSD formally advertised for bids from prospective general contractors including Darin and Blount. The CRSD's original Invitation For Bids [IFB] required the general contractor to whom the contract is awarded to perform 42% of the total contract with his own forces and to sublet no more than 58% of the contract to subcontractors.[7] The first bids from general contractors were received by CRSD on August 14, 1975, and it determined that Blount was the apparent low bidder.[8] A protest was made to the CRSD by Darin and others charging that Blount's bid was non-responsive to the IFB. The protesters argued, *inter alia*, that the IFB required each bidder to fully detail in

"The grantee agrees to expeditiously initiate and complete the project or cause it to be constructed and completed in accordance with the grant agreement and application approved by the Regional Administrator. The Regional Administrator must terminate the grant if initiation of construction for a Step 3 project has not occurred within one year after award of grant assistance for such project: *Provided*, That the Regional Administrator may defer such termination for not more than six additional months if he determines that there is good cause for the delay in initiation of project construction."

7. See SIB–5 at *Admin. Record*, Tab 13, Exhibit G, Attachment No. 5, pps. 1–2.

8. *Admin. Record*, Tab 19, Exhibit M, pps. 1, 3. The exhibits in Tab 19 are marked in the upper righthand corner of the page.

the "List of Proposed Subcontracts"[9] [LPS–1] all work which Blount expected to subcontract. The protesters also argued that the "List of *Subcontracts*" [LPS–1] was the only document in which a bidder could state a comprehensive list of subcontracted work.[10]

After the first opening of bids Blount, in its brief before the CRSD, argued that the IFB demanded bidders to demonstrate compliance with the 42% requirement in the "List of *Proposed Subcontractors*" [LPS–2], which was to be filed *subsequent* to the opening of bids. In the alternative, Blount argued that its failure to show compliance with the subcontracting limitation in the LPS–1 form which was attached to its bid was a mere informality, which did not substantially affect the bid, and was therefore waivable by CRSD. Blount argued:

> "It is obvious from the bid documents that the primary purpose in obtaining the subcontract information is to determine that the general contractor will perform at least 42% of the contract work. That determination *cannot* be made from the list of 'Proposed Subcontracts (items of work),' [LPS–1] but can only be made from the list of 'Proposed Subcontractors' [LPS–2] with prices which are due within 72 hours . . . . In any event, if the listing 'proposed subcontracts' was an informality, which Blount denies, it is obviously one which the district can and should waive." [11]

The record currently before this court does not indicate whether Blount's August, 1975 analysis of the terms of the IFB was accepted or rejected by either CRSD or EPA. The protest to the CRSD's determination that Blount was the apparent low bidder on the first solicitation for bids resulted in CRSD's rejection of *all* bids, and that decision was sustained by EPA in November, 1975.[12]

Subsequently CRSD readvertised for general contractors, and a second set of bids were received on February 3, 1976, at which time the CRSD, without awarding the contract, determined that the three apparent low bidders were:

| | |
|---|---|
| Darin | $67,300,000 |
| Blount | $68,537,000 |
| Joint Venture | $68,963,000 [13] |

Blount immediately protested to CRSD[14] that Darin's bid was nonresponsive to the IFB, on the theory that it failed to properly show compliance with the 42% no-subcontracting requirement. Blount argued, in total contravention of its earlier position,[15] that the Listing of Prospective Subcontracts [LPS–1] was the only place where the IFB permitted a bidder to show compliance with the 42% rule and that Darin's LPS–1 failed to make the requisite showing. Despite the supplementary document which Darin filed with CRSD on February 18, 1976, showing that its bid was calculated to *conform* to the 42% of no-subcontracting restriction,[16] Blount argued that Darin's second bid was unresponsive.

The CRSD reviewed the bid documents and on March 8, 1976, it rejected Blount's protest expressly finding that the IFB permitted an apparent low bidder to demon-

---

9. A sample LPS–1 form can be found in *Admin. Record*, Tab 13, Exhibit D. This is an attachment which contains Darin's LPS–1 form which it filed in the second round of bidding.

10. See footnote 8, *supra*.

11. See Blount's brief before the CRSD in the protest action arising from the first opening of bids, *Admin. Record*, Tab 19, Exhibit M, pp. 14.

12. See Blount's brief before the EPA dated April 7, 1976. *Admin. Record*, Tab 19, pp. 14.

13. Opinion of the EPA Administrator, *Admin. Record*, Tab 22, pp. 2.

14. Blount initiated its protest pursuant to 40 C.F.R. § 35.939(b)(2), (e) (Fed.Reg., December 17, 1975).

15. See text accompanying footnote 11, *supra*.

16. See *Admin. Record*, Tab 7; and *Black Binder*, Exhibit E. The *Black Binder* contains material which the parties, pursuant to a written stipulation filed on May 28, 1976, agreed to supplement to the record in this court. See also *Admin. Record*, Tab 20, pp. 3.

strate compliance with the 42% no-subcontracting rule by reference to its additional submissions to the CRSD.[17] The rejection of Blount's protest came after the general counsel to CRSD[18] and the project director[19] determined Darin's bid to be in compliance with the bid instructions.

On March 11, 1976 Blount notified the EPA by telegram of its intention to appeal the CRSD decision pursuant to 40 C.F.R. §§ 35.939(b), (e)(1).[20] A letter, with supporting documentation, giving notice of Blount's intent to appeal was sent on March 11 and received by EPA on March 15, 1976. The issue which Blount raised before the EPA was whether Darin's bid was responsive to the CRSD's Invitation For Bids [IFB], as required by 40 C.F.R. § 35.398–4(h)(1), (2), which pertinently provides:

"(h) *Award to the low, responsive, responsible bidder.*

(1) After bids are opened, they shall be evaluated by the grantee in accordance with the methods and criteria set forth in the bidding documents.

(2) The grantee may reserve the right to reject all bids. Unless all bids are rejected, award shall be made to the low responsive, responsible bidder."

On May 13, 1976, the EPA, after conducting a *de novo* review of the CRSD's ruling, determined that Darin's bid was unresponsive to the 42% no-subcontracting limitation in the IFB, and ordered the CRSD to disqualify Darin's bid and evaluate the remaining bids.

On May 20, 1976 Darin initiated this action to review the EPA's May 13, 1976 ruling and to obtain an injunction restraining the CRSD from implementing the EPA's order.

## II.

### THE ISSUES

Darin's appeal to this court raises two issues:

1. Whether the EPA had jurisdiction to conduct a *de novo* review of the CRSD's finding that Darin's bid conformed with the IFB?

2. Whether the EPA's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under 5 U.S.C. § 706(2)(A)?

■ Since the court finds that the EPA had jurisdiction in this matter,[21] the court focuses on Darin's argument that the EPA's action was arbitrary and contrary to law.

■ The central issue before this court is whether the decision of the EPA has a

---

17. See *Admin. Record*, Tab 9, pp.1; Tab 20, pp. 3; Tab 11, pp. 1, § 1.

18. See *Admin. Record*, Tab 9.

19. See Engineering Consultant's Report, *Admin. Record*, Tab 13(E), pp. 2.

20. See *Admin. Record*, Tab 12, pps. 1–2.

21. Darin argued that the EPA lacks power to issue the administrative regulation which sets forth the procedures under which this appeal was prosecuted to the EPA because Congress, in enacting 33 U.S.C. § 1251 *et seq.*, and § 1281 *et seq.*, never granted the EPA such powers of review. While it is true that Congress desired to place primary responsibility upon the states for implementing water clean-up programs, 33 U.S.C. § 1251(b), the court is not yet convinced that the protest regulation, 40 C.F.R. § 35.939, exceeds the EPA's authority. The court does note, however, that this administrative appeal provision, furnishing a *de novo* review by the

EPA of a local board's decision, seriously threatens the congressional policy stated in 33 U.S.C. § 1251(f), which reads:

"It is the national policy that to the maximum extent possible the procedures utilized for implementing this chapter shall encourage the drastic minimization of paperwork and interagency decision procedures, and the best use of available manpower and funds, so as to prevent needless duplication and unnecessary delays at all levels of government."

Darin also argues that the EPA lacked jurisdiction over this appeal because Blount failed to file its appeal in a timely fashion, pursuant to 40 C.F.R. § 35.939(b) (Fed.Reg., December 17, 1975). The EPA expressly found that Blount's appeal was timely, *Admin. Record*, Tab 22, pp. 3, fn. 2. This court's independent examination of the record convinces it that Blount did file its appeal in a timely fashion. See *Admin. Record*, Tab 11, pp. 2; Tab 12, pp. 1; Tab 13, pp. 1.

rational basis. *See, e. g., Sabin v. Butz*, 515 F.2d 1061, 1067 (10th Cir., 1975); *American Trucking Associations, Inc. v. FCC*, 126 U.S. App.D.C. 236, 377 F.2d 121, 134 (1966), cert. denied, 386 U.S. 943, 87 S.Ct. 973, 17 L.Ed.2d 874. This court is not permitted to substitute its judgment for that of an administrative agency's in an appeal if the agency's decision is based upon conclusions which are reasonably reached after due consideration of all relevant issues. *See, Law Motor Freight, Inc. v. C.A.B.*, 364 F.2d 139, 144 (1st Cir., 1966). But the deference that this court must show to the conclusions which an administrative agency draws does not lessen this court's duty to thoroughly inquire into the factual basis supporting an agency's conclusions in order to insure that the conclusions reached are rational, reasonable and just in light of evidence presented in the record.

In this case, after having carefully and thoroughly reviewed the record as well as the pertinent law, I find that the EPA's conclusions with respect to the requirements of the IFB and Darin's adherence to those requirements are not supported by the documents in the record, and are therefore unreasonable. Further the EPA failed to properly apply Ohio law in deciding the crucial issue of *when* a variation between an IFB and a bid on a public works contract is substantial enough to affect the fairness of the bidding process.

**22.** See 40 C.F.R. § 35.938–4(h)(1), (2) (Fed.Reg., December 17, 1975); Opinion of the Administrator, *Admin. Record*, Tab 22, pp. 3.

**23.** The SIBs are written instructions to bidders informing them of the information they must furnish in their bids. LPSs are forms on which the bidders must furnish the required bid information. All of the SIBs and LPSs that are pertinent to this case may be found in the *Admin. Record*, Tab 13. All of these documents were drafted by the CRSD.

**24.** SIB–2 is set forth in the *Admin. Record*, Tab 13, Exhibit G, Attachment 5. It states in total.
"Each bidder shall list, in the appropriate page(s) of the Bid, all items of work which he proposes to subcontract should he be awarded the Contract for this project.
"In addition, the apparent low Bidder as read at the Bid opening, shall submit not later than

## III.

## THE EPA'S ANALYSIS OF THE BID DOCUMENTS

The EPA recognized that its review of the CRSD determination was limited to deciding whether CRSD accurately determined the responsiveness of Darin's bid.[22] The EPA reviewed Blount's administrative appeal by construing several separate portions of the Supplemental Instructions to Bidders [SIB] issued by the CRSD and the listing forms [LPS] which the CRSD required all bidders to complete as attachments to their bids.[23] After the EPA reached its own, independent decision regarding the construction to give to the bid instructions and the information which the listing forms were designed to elicit, it concluded that the documents which Darin submitted did not furnish the information called for by its [the EPA's] understanding of the bid instructions and listing forms.

The first instruction which the EPA construed was SIB–2,[24] which stated that "Each bidder shall list, *in the appropriate page(s) of the Bid*, all items of work which he proposes to subcontract, should he be awarded the contract for this project" (emphasis added).[25] The EPA Administrator then concluded that the CRSD's listing forms contained only one *"appropriate page"* on which a bidder could list "all items of work which he proposed to subcontract," and that form was LPS–1.[26] The EPA Administrator also noted that:

seventy-two (72) hours following the appointed time of the Bid opening, a complete list of all subcontractors who, if approved, the Bidder will use in the performance of this Contract. This listing shall include the name of the subcontractor, the items of work he is expected to perform, the dollar value of his subcontract, and the principal place of business of the subcontractor. Only those sub-contractors whose work will exceed one hundred thousand ($100,-000) dollars need be listed at this time."

**25.** See Opinion of the EPA Administrator, *Admin. Record*, Tab 22, pp. 4 (emphasis is the same as in the Opinion).

**26.** LPS–1 is the list of proposed subcontracts which appears in the *Admin. Record* at Tab 13. See also the Opinion of the EPA Administrator, *Admin. Record*, Tab 22, pp. 4.

"The second paragraph of SIB–2 sets up the further requirement that the three apparent lowest bidders as read at the time of bid opening must submit within 72 hours a complete list of subcontractors who, if approved, will be used by the bidder in the performance of the contract. The listing requirement is limited to subcontracts in excess of $100,000, and is to be provided on LPS–2 and LPS–3. No other submittals are required by the bid documents either with the bid, or after bid opening." [27]

■ After concluding that each bidder was required to furnish a complete statement of the precise dollar value of each subcontract on the LPS–1 form, *prior to the selection of the apparent low bidder*, the EPA Administrator determined that bidding instruction SIB–5 [28] required the CRSD to ultimately reject any bid in which the bidder proposed to build less than 42% of the total project with its own forces.[29] Thus the EPA concluded that under the IFB 42% was required to be performed by the general contractors and that a *final award* of the contract to a bidder who could not affirmatively demonstrate compliance with the 42% test would constitute an *award* to an "unresponsive" bidder in violation of 40 C.F.R. § 35.938–4(h)(1), (2).

After construing the bid instructions and forms to require every bidder to individual-ly enumerate each item of subcontracted work on the LPS–1 form in order to establish compliance with the 42% test *prior to award of the contract*, the EPA Administrator examined the CRSD's determination of whether Darin's bid responded to the bid instructions. The Administrator construed Addendum V, ¶ 10 to the bid instructions as the CRSD's expression of the method it planned to adopt in determining a bidder's compliance with the mandatory 42% no-subcontracting rule. Addendum V, ¶ 10 states:

"The amount of the subcontract indicated, and to be used for the purpose of determining compliance with the 58 percent limitation on subletting, shall be the amount indicated in the Bid for the line item sublet. That is to say that if for example it is intended to sublet the concrete work then the amount of the subcontract for the purpose of this section will be the sum of Bid Reference Numbers 10A through 10J inclusive, or if it were intended to sublet the structural metal the amount of the subcontract would be the sum of Bid Reference Numbers 12A and 12B." [30]

Noting that Addendum V, ¶ 10 referred to the amount in the Bid for the *line items sublet* and reiterating his conclusion that LPS–1 is the *only* place in the bid forms in which the bidder may indicate which "line items" are to be sublet, the Administrator

---

27. See Opinion of the EPA Administrator, *Admin. Record*, Tab 22, pp. 5. Examples of the LPS–2 and LPS–3 forms can be found in the *Admin. Record*, Tab 13.

28. SIB–5, which is a Supplemental Instruction to Bidders which was drafted by the C.R.S.D., states:
"The C.R.S.D. reserves the right to reject any Bid in which the Bidder proposes to utilize the services of subcontractors to perform work that, in the opinion of the Director, constitutes a disproportionate amount of the unofficial total of the Bid.
"The C.R.S.D. has determined that in order to comply with this requirement, the Bidder must furnish and install with his own forces, work amounting to not less than 42% of the total amount bid for this project." See *Admin. Record*, Tab 13, Attachment No. 5.

29. The Court agrees with the EPA Administrator that the 42% limitation is mandatory. See

*Admin. Record*, Tab 22, pps. 5–8. However, the Court holds that Ohio law, not the Federal Comptroller General's Reports, is controlling on the issue of responsiveness. See footnote 53, *infra.*

30. See Opinion of the EPA Administrator, *Admin. Record*, Tab 22, pp. 8. The test of Addendum V, ¶ 10 appears at *Admin. Record*, Tab 13, Attachment No. 5. This provision, which the CRSD drafted, was added after the first round of bidding failed. The "Bid Reference Numbers 10A through 10J" refers to the numbered line items which compose the *Schedule of Work and Prices*. This Schedule is the document which each bidder was required to file with his bid, which showed the total amount quoted for each item of work on the project. Blount's complete *Schedule of Work and Prices* appears at *Admin. Record*, Tab 18.

decided that the bid instructions intended each bidder to enumerate, on its LPS–1, each "line item" which it intended to subcontract. The Administrator further concluded that the CRSD would examine the subcontracted "line items" appearing on each bidder's LPS–1 form and determine the total amount of subcontracting which each bid contemplated by adding the amounts enumerated for each such "line item" in the bidder's Schedule of Work and Prices. Having used the LPS–1 form to determine the total amount of subcontracting expected by each bidder, the Administrator concluded that the CRSD could easily determine *prior to designating the apparent low bidder*, whether each bid was responsive to the 42% no-subcontracting requirement. Based on this analysis of the bid instructions, the EPA concluded that a bidder could satisfy the subcontracting limitation only by demonstrating that the items listed on his LPS–1 form constituted no more than 58% of his total bid.[31]

After determining the manner in which the IFB required bidders to demonstrate compliance with the 42% test, the EPA Administrator examined "the question of whether C.R.S.D. properly determined that the bid of Darin and Armstrong is responsive to the I.F.B."[32] The Administrator examined the items listed on Darin's LPS–1 form, totaled the dollar value assigned elsewhere in the bid to those items, and concluded that Darin's bid was unresponsive to the 42% no-subcontracting limitation. The Administrator ruled:

> "By applying the test articulated in SIB–5 and analyzed above, the work to be furnished and installed by D & A [Darin] is less than the mandatory 42% of the total bid amount. Without setting forth at length the arithmetic calculations it is clear that C.R.S.D. erred in

finding that D & A bid responsive to the requirements of SIB–5 [i. e. 42% test]. " . . .

> "On L.P.S.–1 D & A listed as items of work to be subcontracted both the mechanical and electrical portions of the contract, but for each one excepted 'major equipment.' This indicates that D & A intends to purchase the equipment, and subcontract the installation. SIB–5 requires the bidder to 'furnish and install' with its own forces in order for the work to be 'credited' toward the 42% retained work. LPS–1 is the place where the bidder is to list those items of work which he will subcontract. The requirement was inserted to prevent a bidder from reaching the 42% figure by furnishing large items of equipment and subcontracting the installation. Any effort to split a line item is not in conformity with SIB–5, paragraph 3 [i. e. Addendum V], and pursuant to SIB–5, para. 2, automatically renders the bid nonresponsive."[33]

## IV.

## THE EPA COMMITTED REVERSIBLE ERROR

### A. THE EPA MISCONSTRUED THE IFB WHICH THE CRSD DRAFTED

■ The EPA's finding that Darin failed to comply with the admittedly mandatory 42% test rests upon its independent analysis of the bid instructions, which the CRSD drafted. If the EPA correctly determined that the CRSD intended all bidders to furnish a comprehensive total of the work it planned to subcontract on LPS–1, then the EPA decision is correct. However, this court finds, as Blount argued after the first bids were opened,[34] that the bid forms and instructions *demonstrate that the CRSD did*

31. See Opinion of EPA Administrator, *Admin. Record*, Tab 22, pps. 8–9.

32. See Opinion of the EPA Administrator, *Admin. Record*, Tab 22, pp. 11.

33. See Opinion of the EPA Administrator, *Admin. Record*, Tab 22, pps. 11–12. The court

notes that nowhere in the bid documents is there express support for the EPA's statement regarding the "crediting" of work toward the 42% limitation. See footnote 28 *supra*.

34. See text accompanying footnote 11, *supra*.

*not design LPS–1 as the form with which it expected to calculate compliance with the 42% requirement.* The calculation of whether a bidder, and later the contractor, complied with the 42% requirement was intended by CRSD to be made *after* the determination of the low bidder.

## THE BID FORMS

The heading of LPS–1 states: "LISTING OF PROPOSED SUBCONTRACTS (ITEMS OF WORK)". There is no location on the LPS–1 form for the bidder to indicate the dollar value of each type of work which it expects to subcontract, nor is there a designation on the form for the bidder to indicate particular *line item* numbers from the Schedule of Work and Prices [35] that would enable the CRSD to calculate the total dollar value of the work to be subcontracted. Furthermore, the Schedule of Work and Prices in which each bidder indicates is cost for each line item of work in the contract consists of over 130 separate line entries, while LPS–1 has space for no more than 46 [36] separate line item entries.[37] The format of LPS–1 demonstrates that it was not designed to enable the CRSD to calculate precisely the amount of subcontracting a bidder contemplated; instead it was intended to elicit a general, generic statement regarding the type of work which the bidder planned to subcontract.[38]

The bid form LPS–2 furnishes clear and convincing evidence that a determination as to the 42% requirement was to be made after the submittal of material needed to calculate the low bidder. LPS–2 reads in part: "LISTING OF PROPOSED SUB-CONTRACTORS (to be submitted within 72 hours following scheduled time of bid opening by the apparent low bidder)." [39] LPS–2 also specifies that all subcontracts, $100,000 or over, be listed in three columns titled "portion of work," "amount of work," and "proposed subcontractor." It is clear from the design of this form that it was intended to elicit precise information that would enable the CRSD to make a prima facie determination of whether the low bidder met the 42% requirement.[40]

## THE BID INSTRUCTIONS

In analyzing the bid instructions in light of what has already been said about the bid forms, it is important to note that there is nothing in the bid instructions that informs the bidder that he must demonstrate compliance with the 42% test by his listing of subcontracts in the LPS–1 form. The EPA infers such a requirement from the language of SIB–2 which states:

> "Each Bidder shall list, in the appropriate page(s) of the Bid, all items of work which he proposes to subcontract should he be awarded the Contract for this project." [41]

**35.** For an example of the "Schedule of Work and Prices," see *Admin. Record*, Tab 18, which contains Blount's *Schedule.* The term "line item of work" refers to each enumerated line in the Schedule.

**36.** See Darin's LPS–1 in *Admin. Record*, Tab 13. The form contains 23 lines and room for two columns of listings, totaling 46 possible entries. An example of line items of work appears in Blount's Schedule of Work and Prices in *Admin. Record*, Tab 18. A line by line analysis of Darin's quoted prices appears in *Admin. Record*, Tab 7, and *Black Binder*, Exhibit E.

**37.** Thus, if the EPA is correct in its determination that LPS–1 is the only document on which a bidder can show compliance with the 42% no-subcontracting requirement then, by implication, the CRSD would have restricted bidders to subcontracting no more than 46 of the indi-

vidual line items which appear in the Schedule of Work and Prices. However, the record, including the bid instructions, does not indicate that the CRSD intended to restrict to 46 the number of line items which bidders could subcontract.

**38.** It is important to note that this is the finding of CRSD's general counsel. See *Admin. Record*, Tab 9, pp. 3, ¶ 5.

**39.** See *Admin. Record*, Tab 13, Attachment 5.

**40.** This would be done by simply comparing the amount of work listed to be subcontracted on LPS–2 and the aggregate monetary amount of line items over the $100,000 bid in the low bidder's Schedule of Work and Prices.

**41.** See *Admin. Record*, Tab 13, Attachment 5.

There is *no* language that requires that all subcontracts must be listed by line item number in LPS–1, so that the 42% test can be applied to that list.[42] SIB–2 requires only that a bidder, furnish in his bid, a general, generic list of all "items of work" which he proposes to subcontract. This list, which Darin properly furnished on its LPS–1, was designed by the CRSD to provide information concerning the general types of work which the bidder expected to subcontract prior to the CRSD's determination of the *apparent low* bidder.[43] CRSD, the party which drafted the bid instructions and forms, clearly understood that LPS–1 was designed to contain only a generic list of subcontracts, and that it was not a document to which the 42% test would be applied.[44] This view is supported by the examples recited in Addendum V., ¶ 10 which modified SIB–2.[45] The first example deals with subcontracting the generic work item "concrete work," and recognizes that such a generic item may embrace a multiplicity of the numbered line items that appear in the Schedule of Work and Prices.[46] While Addendum V, ¶ 10 does state that the 42% test is to be applied to the aggregate total of "line items sublet,[47]" it does not indicate where in the bid those subcontracted line items must be listed or at what stage, prior to the award of the contract, the CRSD will determine compliance with the 42% test.

SIB–5, the bid instruction which expresses the mandatory 42% no-subcontracting limitation, states that "*bids*" which do not comply with that test will be rejected. However, SIB–5 does not state when in the bidding process, or upon what bid documents, CRSD will determine a bidder's compliance with the subcontracting limitation. The EPA implicitly assumed that the 42% requirement had to be satisfied *before* the CRSD determined which of the bidders was the "apparent low bidder." Consequently, the EPA mistakenly concluded that LPS–1 was the document in which compliance with the 42% test must be established because it was the only form which furnished the CRSD with aggregate subcontracting information *before* the CRSD determined the apparent low bidder. However, as we have already determined, nothing in the bid forms or instructions states that LPS–1, or any other bid document, was designed to

42. Compare the listings on Darin's LPS–1 (*Admin. Record*, Tab 13), with the lists called for on the Schedule of Work and Prices (*Admin. Record*, Tab 18).

43. Such a generic list would be a valuable asset to CRSD in determining the accuracy of any detailed, line-item by line-item, statement of the low bidder regarding his subcontracting plans furnished after the filing of a protest to declaring such a bidder the "apparent low bidder." If the apparent low bidder's detailed supplement showed that he planned to subcontract line items which were not covered by the generic list which he submitted on the LPS–1, then the CRSD would have reason to suspect the accuracy and candor of the detailed line item submission, and the CRSD might then grant the contract to a protester. Of course, under this theory of the function of the LPS–1 list, no such inquiry would be necessary unless there was a protest to the designation of the apparent low bidder. This view is consonant with the view of the CRSD that the 42% test was to be applied to documents received *after* the designation of the apparent low bidder. See *Admin. Record,* Tab 9, pp. 2, ¶ 4. Darin's LPS–1 covers, in generic fashion, all the line items which it planned to sublet. *Compare, Admin. Record,* Tab 13, with *Admin. Record,*

Tab 7 and *Black Binder*, Exhibit E. The last two generic entries on Darin's LPS–1 form [i. e. Mechanical (Except Major Equipment) and Electrical (Except Major Equipment)] appear to encompass a multiplicity of line items.

44. See the CRSD's counsel's recommendation to the Board regarding Blount's protest. *Admin. Record,* Tab 9, pp. 3, ¶ 3 provides,

"It is not inconsistent with the bid documents to list an item of work on page LPS–1 as a *proposed* area of subcontracting work  . .." (emphasis in original).

The full Board acted on this recommendation. See *Admin. Record,* Tab 11, pp. 1, § 1. See also *Admin. Record,* Tab 20, pp. 5.

45. SIB–2 is quoted in full in footnote 24, *supra.* See also *Admin. Record,* Tab 13, Attachment 5.

46. See text accompanying footnote 30, *supra.*

47. The Court disagrees with the EPA's finding that Addendum V, ¶ 10 prohibits "line-splitting," i. e., subcontracting a portion of an enumerated line item as those items are designated in the Schedule of Work and Prices. *Compare, Admin. Record,* Tab 22, pp. 12, with this Court's Opinion, part IV(B), *infra.*

demonstrate compliance with the subcontracting limitation. The EPA's analysis overlooks the CRSD's intention that compliance with the 42% requirement be assessed *after* the determination of the "apparent low bidder," but *before* the CRSD officially accepted any of the bids.[48] SIB–2[49] and LPS–2[50] both reveal the CRSD's intention to examine information from bidders *after* determining the apparent low bidder, and therefore the opening of bids did not conclusively determine which bidder would receive the contract. Thus compliance with the 42% test, which had no bearing on the initial question of who was the apparent low bidder,[51] could be established from bid documents which were supplemented by subsequent submittals designed to clarify the 42% question. The record in this case demonstrates that Darin furnished an additional submittal,[52] after the determination that it was the apparent low bidder and before the award of the contract, which established compliance with the 42% requirement. However, the EPA arbitrarily refused to consider this material.[53] The record also demonstrates that the CRSD properly relied upon Darin's supplemental submission in determining that Darin's bid was responsive to the 42% limitation *before* awarding Darin the contract.[54]

The record establishes: that Darin demonstrated compliance with the 42% requirement prior to the CRSD's acceptance of Darin's bid, as required by SIB–5 of the bid instructions; that the EPA improperly construed the bid documents, and arbitrarily

ignored the material on which the CRSD relied in determining that Darin's bid was responsive. However, this court's decision that the EPA erroneously ruled Darin's bid unresponsive to the 42% limitation is not dispositive of this appeal because the material with which Darin established compliance with the 42% test raises the additional question of whether its bid was responsive to the Addendum V, ¶ 10 bid instruction which the EPA found precludes subcontracting part of a numbered line item of work, as those work items are designated in the Schedule of Work and Prices.

*B. THE EPA IMPROPERLY INTERPRETED ADDENDUM V AND FAILED TO PROPERLY APPLY OHIO LAW IN DETERMINING WHEN A VARIATION BETWEEN AN IFB AND THE LOW BIDDER'S BID IS SUBSTANTIAL ENOUGH TO RENDER THE BID UNRESPONSIVE.*

Addendum V, ¶ 10, which explicitly modifies SIB–5, states:

"The amount of the subcontract indicated, and to be used for the purpose of determining compliance with the 58 percent limitation on subletting, shall be the amount indicated in the Bid for the line item sublet. That is to say that if for example it is intended to sublet the concrete work then the amount of the subcontract for the purposes of this section will be the sum of Bid Reference numbers 10A through 10J inclusive, or if it were intended to sublet the structural metal the amount of the subcontract

---

**48.** See CRSD's counsel's recommendation, *Admin. Record*, Tab 9, pp. 2, ¶ 2, ¶ 4; Tab 11, pp. 1, § 1; Tab 20, pps. 3–4.

**49.** See footnote 24, *supra*, and *Admin. Record*, Tab 13, Attachment 5.

**50.** See the sample LPS–2 form in *Admin. Record*, Tab 13.

**51.** The EPA appears to recognize the distinction between the "apparent low bidder" and the "low, responsive, responsible bidder." See *Admin. Record*, Tab 22, pp. 2. See also counsel Rego's letter referring to "the *possible* award of the . . . contract" to Darin after it was declared the apparent low bidder. *Admin. Record*, Tab 6.

**52.** See *Admin. Record*, Tab 7; *Black Binder*, Exhibit E; *Admin. Record*, Tab 20, pp. 3.

**53.** See Opinion of the EPA Administrator, Tab 22, pp. 11.

**54.** The Court notes that to this day, the CRSD has not awarded the contract to Darin. All that has occurred is that the CRSD's decision that Darin's bid is the "apparent low bid," and that it is responsive to a few of the bid requirements, has been reversed. The CRSD never determined that Darin is the "low, responsive, responsible bidder," 40 C.F.R. § 35.938–4(h)(2), and it has not yet let the contract to any bidder.

would be the sum of Bid Reference numbers 12A and 12B."[55]

The EPA incorrectly interpreted this bid instruction to require that each bidder satisfy the 42% requirement by demonstrating that its subcontracting arrangements would not split any of the numbered line items enumerated in the Schedule of Work and Prices.[56] The supplemental material which Darin submitted to establish its compliance with the 42% test indicates that Darin plans to subcontract a portion of five of the scheduled line items in violation of the alleged prohibition on splitting expressed in Addendum V, ¶ 10.[57]

▮ It is this court's finding that Addendum V was intended to inform the bidder how, in a general way, satisfaction of the 42% requirement was to be determined. It was not meant to pass on the issue of line splitting. If it had been, the addendum language would have simply stated that line splitting was not allowed. Instead the Addendum uses language such as what the bidder "intended to sublet" which does not indicate that any restriction is placed on line splitting, but instead indicates that whether to line split or not is in the discretion of each bidder. If the CRSD meant to restrict line splitting, it would have expressly incorporated that specification into the bid instructions and not added it as an afterthought in an addendum. Further,

LPS–2, which contains columns titled "*portion* of work" and "amount of work" actively contemplates the splitting of the enumerated line items. The CRSD's view of the issue is made clear by its acceptance of Darin's bid as being responsive.

▮ However, if there is a variation, this variation is not substantial because the record does not demonstrate that the variation furnishes Darin with a price related competitive advantage over Blount.[58] *See, National Engineering & Contracting Company v. City of Cleveland*, (Ohio Com.Pl. 1957), 146 N.E.2d 340, 345.[59] Under *National Engineering* the question of whether a formally advertised public works bid is responsive to the IFB requires a two step inquiry: First, does the bid deviate from a requirement of the IFB?; Second, if such a deviation exists, is it substantial? The Court set forth the test for determining whether a deviation is substantial when it wrote:

"But not every variation from the specifications will destroy the competitive character of the bid. To have that effect *the variation must be substantial.* To be substantial *it must affect the amount of the bid. It must give the bidder an advantage or benefit not allowed to other bidders. It must be an element considered in fixing the price.*" *National Engineering, supra* at 345, (emphasis added).

**55.** The figures which Darin used to show compliance with the 42% test are consistent with the price quotations which appear in its Schedule of Work and Prices. Since Darin's compliance with the 42% test is consistent with "the amount indicated in the Bid for line item[s] sublet," Darin complies with the 42% limitation in the manner contemplated by Addendum V.

**56.** For an example of the Schedule of Work and Prices, see *Admin. Record*, Tab 18. "Splitting" refers to subcontracting *a portion of a* line item. See *Admin. Record*, Tab 7, line items 1A, 1B, 2A, 9, 14.

**57.** Darin plans to split line items 1A, 1B, 2A, 9, 14. See *Admin. Record*, Tab 7; *Black Binder*, Exhibit E.

**58.** Significantly Blount, which had the burden of proof, see 40 C.F.R. § 35.939(g)(1) (Fed.Reg., December 17, 1975) failed to present any evidence that it was prejudicially effected by Da-

rin's line splitting. See *Affidavit of Joseph Willis, Admin. Record*, Tab 19, which states that a failure of Darin to meet the 42% requirement was prejudicial to Blount, but does not refer to any prejudice caused by line splitting.

**59.** The EPA cited this case, but failed to systematically apply the Ohio test for nonresponsiveness. The EPA erroneously applies federal law on this question. Ohio law is the proper law to apply because the legislative and administrative scheme of 33 U.S.C. §§ 1251, *et seq.,* § 1281 *et seq.,* contemplates that states will take primary responsibility for implementing the federal grants. See 33 U.S.C. § 1251(b); 40 C.F.R. § 35.939(f) (Fed.Reg., December 17, 1975); *North Construction Company v. Mayo*, Case No. C75–560 (D.C.Mich., December 23, 1975), p. 8. Even Blount has indicated that it believes Ohio law controls the responsiveness question. *Admin. Record*, Tab 19, Exhibit M, pp. 6.

Under Ohio law, before a variation between the IFB and the low bid will render the bid unresponsive, the record must show that the variation furnished a price-related, competitive advantage to the non-conforming bidder. The record in this case conclusively shows that Darin reaped no price-related competitive advantage over Blount by subcontracting portions of numbered line items, allegedly in violation of Addendum V, ¶ 10.[60]

Darin subcontracted portions of five separate items. In three of those line items Blount's price was *lower* than, or equal to, that of Darin despite Darin's subcontracting a portion of the line item.[61] Thus Darin's subcontracting furnished it with no price advantage on each of those three lines. On two of the numbered work items which Darin split, lines 1A and 2A, Darin quoted a lower line price than that offered by Blount.[62] However, that price differential cannot be attributed to Darin's subcontracting lines 1A and 2A because Blount also subcontracted the same two line items. Therefore, Darin's deviation from the line-splitting requirement is not a substantial variation from the IFB because the price differential between Darin's and Blount's bid cannot be attributed to Darin's subcontracting a portion of a numbered line item.

## V.

### THE COURT'S FINDINGS

The Court finds that CRSD properly determined that Darin was the apparent low bidder, and that Darin's bid was responsive to the 42% limitation expressed in SIB–5 of the IFB. The Court also finds that the CRSD accurately determined that there was no limitation on line splitting; but if there was a limitation Darin's deviation

from that requirement is not "substantial" under the applicable Ohio test of substantiality. Consequently the Court grants Darin's appeal, and reverses the EPA ruling in *In re: Cleveland Regional Sewer District, Westerly Advanced Wastewater Treatment Project Contract III–IV,* dated May 13, 1976. The Court issues a permanent injunction enjoining the CRSD from implementing the EPA's ruling, and orders the CRSD to proceed with the letting of the contract pursuant to its initial determination that Darin is the apparent low bidder.

The Court denies the CRSD's claim for money damages.

This Memorandum is adopted as Findings of Fact and Conclusions of Law pursuant to Rule 52(a), Fed.R.Civ.P.

---

60. *Compare*, Darin's documents, *Admin. Record*, Tab 7, and *Black Binder*, Exhibit E, with Blount's analysis of its own LPS–1, dated February 6, 1976, in *Admin. Record*, Tab 13, and Blount's *Schedule of Work and Prices* in *Admin. Record*, Tab 18.

61. See documents cited in footnote 60, *supra* and compare Darin's treatment of line items 1B, 9, 14, with that of Blount. Darin's totals

for these lines are respectively $675,000; $130,000; and $520,000; while Blount's respective totals are $500,000; $130,000; and $100,000.

62. See documents cited in footnote 60, *supra* and *compare* Darin's treatment of line items 1A, 2A, with that of Blount. See Blount's February 6, 1975 submission in *Admin. Record*, Tab 13.