**UNITED STATES, Plaintiff,**

v.

**DISTRICT COUNCIL OF NEW YORK CITY AND VICINITY OF the UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA, et al., Defendants.**

**No. 90 Civ. 5722 (CSH).**

United States District Court, S.D. New York.

April 6, 1995.

**1056**

Jed S. Rakoff, Fried Frank Harris Shriver & Jacobson, New York City, Kevin P. Gilleece, Gilleece & Gilleece, White Plains, NY, for defendant District Council of NYC & Vicinity of United Broth. of Carpenters.

Gary P. Naftalis, Kramer, Levin, Nessen, Kamin & Frankel, New York City, Kevin P. Gilleece, Gilleece & Gilleece, White Plains, NY, for defendant John P. Abbatemarco.

Daniel Riesel, Sive, Paget & Riesel, P.C., New York City, Kevin P. Gilleece, Gilleece & Gilleece, White Plains, NY, for defendant Paschal McGuinness.

Henry Putzel, III, Henry Putzell, III, New York City, Kevin P. Gilleece, Gilleece & Gilleece, White Plains, NY, for defendant Robert J. Cavanaugh.

### MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

This opinion emanates from a Consent Decree entered into by the United States (the "Government") and the District Council of New York City and Vicinity of the United Brotherhood of Carpenters and Joiners of America ("District Council"), settling a civil RICO action brought by the Government against the union and certain of its officers in September of 1990. In that action, the Government alleged, in substance, that certain former officers and representatives of the District Council and its constituent locals (collectively, the "Union") had engaged in a variety of forms of labor racketeering. The Government also alleged that the operations of the Union had been infected by a criminal element, specifically, La Cosa Nostra[1], and that the existence of this criminal influence had resulted in the Union being maintained and run in a corrupt and undemocratic manner.

One month into trial, the parties reached the settlement manifested in the Consent Decree. In the preamble to that document, the parties agreed on the following: that former officers and representatives of the District Council and certain of its constituent locals had been convicted of labor racketeering; that there should be no criminal element or La Cosa Nostra corruption of any part of union operations or activities; and that one of the purposes of the Consent Decree was to ensure that the Union be maintained and run democratically, and without unlawful influence from outside its membership. As part of the settlement, all current and future officers, employees, and members of the Union were permanently enjoined from continuing any racketeering activity, from knowingly associating with any member of any La Cosa Nostra crime family or other criminal group, and from obstructing or otherwise improperly interfering with the implementation of the Consent Decree. Consent Decree, ¶ 2.

One of the key mechanisms for effectuating the purposes of the Consent Decree was the temporary appointment of an Investigations and Review Officer ("IRO"), who was endowed by the Consent Decree with a variety of specific and general powers designed to enable him and his staff to implement the terms of the Consent Decree.[2] ¶ 4. The

---

1. "La Cosa Nostra" refers to a nationwide crime organization which is divided into units called "families." It is an Italian phrase that translates into English as "our thing" or "this thing of ours."

2. By agreement of the parties, Kenneth Conboy, a former federal judge and now a partner at the firm of Mudge, Rose, Guthrie, Alexander, and Ferdon, was appointed as the Investigations and Review Officer.

present opinion is prompted by disputes regarding the lawful scope of the IRO's powers, and the merits of certain decisions made by the IRO in exercise of those powers. While the parties have had prior disputes over this general topic, the present disputes revolve around the IRO's exercise of his powers with regard to the conduct of the upcoming election of District Council officers.

That election, according to the Consent Decree, was scheduled for June of 1995, and it is clear from the Consent Decree and the events leading up to it that the parties believed a fair and democratic election was a critical component of the overall effort to reform the Union. There is evidence that past elections have not always been fair and democratic[3], and the IRO's appointment and election responsibilities were designed not only to ensure that those elected obtain their positions fairly, but that the rank-and-file members have restored to them the sense that the Union was operated democratically, and that those holding office were their representatives in the truest sense of the word.

Under the Consent Decree, the IRO is given the power to "supervise" all phases of the upcoming election. ¶ 4(i)(1). He is also directed to draft rules for the conduct of such election, setting out procedures for the nomination of candidates, dissemination of information about nominated candidates to the membership, and the conduct of the final secret ballot election. ¶ 4(i)(3). These draft rules are disseminated to the membership for comments, and the IRO is then to submit final rules to the Court. Upon approval by the Court, those rules become the final rules for the election, and are incorporated into the By–Laws of the District Council. *Id.*

The IRO disseminated the draft rules to the membership and forwarded the received comments to both the Court and the District Council.[4] The IRO then submitted the proposed Final Election Rules ("FERs") to the Court for its approval. In reviewing the proposed FERs, the Court is aided by the IRO's explanations of why he crafted the rules as he did, the District Council's objections to those rules, and the comments from the membership received by the IRO and forwarded to the Court.[5]

Most of the objections to the FERs are based on claims that the IRO has exceeded his authority under the Consent Decree, and that even when he has acted within his authority, he has abused his discretion in making injudicious decisions. The most contentious dispute, however, relates to the timing of the election, and I do not view this Court's reviewing responsibility with regard to this issue to be purely a matter of judging the propriety of the IRO's view on the matter. I will consider this issue first.

## I. The Timing of the Election

The Consent Decree provides that the IRO is to supervise all phases of a secret ballot election "scheduled for June 1995." While drafting the rules, the IRO's office received comments to the effect that the election should be put off until September, so as to allow opposition candidates sufficient time to mount a meaningful campaign in compliance with the election rules. This objection was particularly emphasized by counsel for Local 608 of the District Council, who wrote:

> "Mounting a district-wide campaign requires a candidate with experience and sophistication; novices stand no chance of success. The pool of potential candidates with these prerequisites is limited, consisting primarily of the business agents of the various locals, who are already elected by direct vote. Even with these prerequi-

3. The Court notes that this statement is not meant, in any way, as a comment on the nature of the election that placed the current District Council officers in their positions. Two current officers, Frederick Devine and Robert Cavanaugh, were originally named in the RICO action. The allegations against them were settled short of judicial resolution.

4. Pursuant to this Court's Order, the District Council received only a summary of those comments, while the Court received both a summary and a copy of the actual comments.

5. For efficiency purposes, both the IRO and the District Council submitted lengthy comments to the Court several weeks earlier, based on the draft election rules, under the belief that many of the disputes likely to arise under the draft rules would be present under the final rules. That belief has been borne out.

sites, however, any challenger can at best be considered no more than a longshot against an incumbent with the extensive resources available to Frederick Devine ("Devine"). As a result, against these odds, no one from this limited pool is likely to jeopardize his local position as business agent to run against Devine. The current timetable, however, forces a business agent to do exactly that to challenge him.

First, any business agent who wants to oppose Devine will be forced to run two campaigns simultaneously, as all seventeen locals within the District Council will be conducting their elections for business agent in June, with nominations in May. The current timetable therefore compels any likely challenger to Devine to divide his resources—which will probably be limited—between two campaigns, while leaving him vulnerable to the charge that he is not serious about one or the other of the two offices that he is seeking, instantaneously creating a likely "lose/lose" situation. Boxed this way from the outset, few, if any, business agents will undertake a campaign for District office.

The current timetable, therefore, virtually precludes a viable candidate from running against Devine."

The District Council leadership vehemently objects to any postponement of the election. They contend that Local 608's comments are politically motivated and prompted by that local's longstanding feud with the District Council.

The IRO contends that while Local 608 raises substantive concerns, the election should still go forward in June. He does so for three reasons. First, the IRO notes that Local 608 makes no reference to a specific candidate who will be harmed by a June election, and in fact, an active opposition candidacy is presently being maintained. Second, the IRO argues that there is no reliable evidence to suggest that the ills and deterrents alleged to flow from a June elec-

tion date are anything but speculative. Finally, the IRO notes that given that both the Consent Decree and the union constitution presume an election in June, the election should go forward at that time in the absence of persuasive evidence militating in favor of an alternative date.

The Consent Decree is not clear as to whether the date of the election is a decision to be made by the IRO, or whether it is to be gleaned from an interpretation of the Consent Decree. Nonetheless, both the District Council and the IRO appear to agree that it is this Court's responsibility to determine what the election date should be. I will therefore make this determination *de novo,* based not on a deferential review of the IRO's recommendation, but on my own interpretation of the Consent Decree.

■ While the Consent Decree states that the IRO is to conduct an election "scheduled for June 1995", I do not view that clause to be a statement suggesting that June was a particularly significant date to the parties. Rather, the clause appears in a section of the Consent Decree concerned with the IRO's role in supervising the election. The provision of a date for the election appears to do nothing more than express the expectation held by the parties at that time regarding when the election was likely to occur. Given the broad purpose of the Consent Decree to root out corruption, and the vital importance attached to the 1995 election being a fair and democratic one, I am certain it was the intent of the parties to the Consent Decree that this date could be changed if doing so would further the overall purposes of the Consent Decree. The District Council has not suggested any reason to think that June has a special significance [6], and indeed, the District Council concedes that the Court has the power to change the date.

Having said this, I find that the election should not go forward in September, as the Local 608 recommends. As the IRO correctly points out, the suggestion that a viable

---

**6.** The District Council, in its letter to the IRO dated March 28, 1995, argues that under the District Council's by-laws, June is historically the month in which elections occur. The Consent Decree, however, alters a number of traditional practices of the District Council, and there is nothing to suggest that the June date contained in the by-laws is anything more than an historical happenstance.

opposition candidacy cannot be maintained under the present schedule is belied by the present existence of just such a candidate. In the District Council election, as well as in most political elections, incumbents tend to have inherent advantages. They tend to have more resources available, more recognition among the electorate, and require less time to mount a viable candidacy. While the existence of such advantages may not be desirable, the Consent Decree was meant to eradicate corruption, not the inherent advantages attendant to incumbency. Many of Local 608's objections relate to such advantages and would be unlikely to be alleviated by a delay of the election.

In addition, I think there is some urgency to holding the election as soon as possible. The IRO's appointment is a temporary one, lasting for a period of 30 months, and scheduled to end around September of 1996. The process of fulfilling the goals of the Consent Decree includes the conduct, study, and evaluation of the 1995 election. The 1995 election will ideally not only be a fair and democratic one, but will also reveal a variety of information about the current state of the union and its practices. The sooner the election can be held and the results studied, the better the sense the IRO will have of the proper focus of the remainder of his tenure.

■ That is not the end of my analysis, however, because while the District Council and the IRO both profess a preference for the earlier election date, which they both refer to as "June", the District Council argues that the IRO's election schedule actually entails the election being held in July. The FERs presently provide for a combined mail/in-person election.[7] Under the FERs, those members requesting a mail ballot will receive their ballot on June 23, 1995. In-person voting will take place during the five day period from July 20 to July 24, 1995.

The District Council argues that the proposed schedule entails a July election rather than a June election, and that July is an undesirable time because many members go on vacation. The IRO does not address the fact that in-person voting is to occur in July,

but notes that he has proposed a schedule for an election to "commence in June."

Whether or not the Consent Decree meant for the election to commence in June, or that it be completed in June, is not the issue, for I have already held that that date is not cast in stone. Completion of the process in June is not appropriate. While I noted earlier that there is some detriment to any delay, the rules make it clear that a variety of things must happen before the election can be held in order to insure a vigorous and fair campaign period. As it is, there are about thirteen weeks between now and the end of June. To eliminate the three extra weeks in July would reduce the campaign period by about 20%, in the face of comments that have been received complaining that the date should be extended to *September* in order to give candidates sufficient time to mount a viable campaign. The District Council has not suggested any steps that could be eliminated or shortened without negatively impacting the campaign period. I decline to make such adjustments on my own when the IRO has already given careful consideration to the time requirements of the various steps.

■ As to the contention that members often go on vacation in July and thus will be unlikely to vote, that, if true, is undoubtedly an undesirable effect of the proposed schedule. Nonetheless, a significantly abbreviated campaign schedule would also have a detrimental effect in prohibiting an opposition candidate from mounting a viable candidacy. In the absence of real opposition, the goal of a fair and democratic election is hardly furthered by widespread turnout. Widespread turnout is an important concern, but it is not the only one, and in this particular situation, I find that the potential negative impact on turnout from holding in-person voting in July is outweighed by the need to afford candidates a minimally adequate campaign period.

If significant numbers of Union members are in fact on vacation in July, that would also impact on a September election by restricting the accessibility of the electorate to the candidates. Holding the election in Octo-

7. The chosen method of balloting is fiercely contested and will be analyzed below.

ber would address that problem, but I do not think the process should be delayed that long.

For the reasons stated above,. I conclude that the 1995 election for the District Council Executive Board should go forward according to the schedule proposed by the IRO in the FERs.

## II. The Election Rules: Power

The arguments of the District Council relating to the IRO's promulgation of the election rules fall broadly into two categories: (1) Certain of the FERs involve the IRO engaging in acts that are unlawful, i.e. beyond the scope of the authority given to him under the Consent Decree; and (2) A number of the FERs, even if authorized by the Consent Decree, are unwise, and should not be approved by the Court.

The first category of these objections relates to the IRO's power, and depends ultimately on the terms of the Consent Decree and the intent of the parties thereto. The second category of objections is subject to the review provided for by Paragraph 6 of the Consent Decree. That provision explicitly requires this Court to review the IRO's proposed FERs. The provision further provides that in reviewing the FERs, the Court shall apply "the same standard of review applicable to review of final agency action under the Administrative Procedure Act." [8] ¶ 6.

The District Council challenges the IRO's power with regard to two areas: (1) Those FERs that entail the IRO conducting the election himself; and (2) FER 3.3 which entitles a nominated candidate to obtain a current list of the union members' names and addresses. I will consider each of these in turn.

## A. Does the IRO Have the Power to Issue the Proposed FERs That Entail Him Conducting the Election?

As noted above, Paragraph 4(i)(1) empowers the IRO to "supervise" all phases of the election. That Paragraph goes on to say that " 'supervise' as used herein shall have the meaning ascribed to it in cases arising under Title IV of the Labor–Management Reporting and Disclosure Act, 29 U.S.C. § 481 *et seq.*"

The District Council objects to certain of the FERs on the basis that they involve the IRO "conducting" various aspects of the election as opposed to merely "supervising." A few of the examples cited by the District Council include: the IRO prepares the Notice of Nominations; Nominating Petitions are provided by the IRO; Nominating Petitions are obtained from the IRO exclusively; at the nomination meeting, the IRO personally announces the candidates; the IRO determines each candidate's ballot position; and the nominated candidate must file with the IRO all campaign, contribution and expenditure disclosure statements. There are numerous other examples of the IRO's active involvement in the election process. The District Council contends that the District Council should run the election, and the IRO may only supervise it:

> "The Rules should provide that the conduct of the election in every respect is carried out by members of the Union. Clearly, the IRO could be present every step of the way and may review every act of the Union to ensure adherence to the Rules. The IRO's role is that of a supervisor, *i.e.,* an overseer, rather than the engineer at the throttle." *District Council Letter to the Court,* March 10, 1995, at p. 11.

The IRO and the Government argue that the power to "supervise" is a broad one, encompassing the role envisioned for the IRO by the FERs. Their argument is two-

---

**8.** Paragraph 4(i)(3) requires that I approve the rules, but does not provide the applicable standard of review. Paragraph 6 provides that in reviewing decisions of the IRO, the Court is to apply the same standard of review as that employed by the APA. Though Paragraph 6 is not a model of clarity, I interpret the promulgation of

the election rules to be a "decision" within the meaning of Paragraph 6. I do so not only because that is the most logical reading of the provision but because given the expansive authority given to the IRO in drafting the rules, the parties could not have intended anything but a deferential review by this Court.

fold. First, both parties argue that the Consent Decree was modeled on the consent decree involved in a case involving the Teamster's Union, before Judge Edelstein of this Court. In that case, a civil RICO action was brought against the Teamster's Union and, as here, the case was settled pursuant to a consent decree. Pursuant to that consent decree, an Election Officer was appointed to "supervise" the election. The Election Officer then crafted a role for himself similar to that proposed by the IRO here. The Teamsters objected on the ground that "supervise" should be narrowly construed to give the Election Officer only a passive role in the election process.

Judge Edelstein agreed with the Election Officer that "supervise" should be interpreted broadly to allow the Election Officer to exercise his powers in the proposed manner. *United States v. International Brotherhood of Teamsters,* 723 F.Supp. 203, 206 (S.D.N.Y. 1989). He based this on a variety of considerations, including the broad meaning of "supervise" in the dictionary, the intent of the parties, and the spirit of the Consent Decree. *Id.* He also found that it had been the parties' intent to define "supervise" as a term of art used in labor law, and that the jurisprudence construing the term had defined it broadly. *Id.*

The Government argues that during the negotiations over the Consent Decree, it was the intention of the parties that the broad meaning of "supervise" embraced in the Teamsters case be incorporated into the present Consent Decree. Apparently, the attorneys representing the District Council during the negotiations also represented the Teamsters, and according to the Government, were well aware of the Teamsters precedent regarding the meaning of "supervise". Thus, the Government argues it was clearly the intent of the parties that "supervise" be defined broadly to give the IRO the power manifested in the FERs.

The IRO's and the Government's second argument is that even if the intentions of the parties were not clear, the meaning of "supervise" under the Labor–Management Reporting and Disclosure Act ("LMRDA") is as broad as that argued for here by the IRO.

The two parties cite several cases which they argue support their position.

The District Council argues that the Teamsters precedent does not control here. In that case, it is argued, the Consent Decree did not provide any guidance as to the meaning of the word "supervise". The Court's opinion is thus not binding in this case, where the Consent Decree refers to a specific body of law for the determination of the meaning of the term.

It is further argued that in concluding that labor law defined "supervise" broadly, Judge Edelstein referred not only to the LMRDA, but to the Labor Management Relations Act and the Landrum–Griffin Act. The District Council concedes that cases under these latter statutes define "supervise" broadly, but contends that the one LMRDA case cited by Judge Edelstein does not support such a reading, nor do the additional cases put forward here by the Government and the IRO. Rather, according to the District Council, cases under the LMRDA emphasize that unions should conduct their own elections.

## Discussion

I begin my analysis by noting that to the extent that the parties thought the manner in which they defined "supervise" in the Consent Decree would provide a clear answer to this foreseeable dispute, they were mistaken. As will be discussed in greater detail below, the case law interpreting the LMRDA is not as clear as either party suggests, nor is the analogy to the supervisory powers of the Secretary of Labor under the LMRDA an easily workable one. Nonetheless, I find that the terms of the Consent Decree and the intent of the parties authorize the IRO to involve himself in the elections to the extent proposed by the FERs.

### The Intent of the Parties

First, I think it was clearly the intent of the parties that "supervise" be defined broadly. Many of the Government's concerns with regard to the conduct of the election were motivated by the belief that historically, incumbents had used their positions to hamper, in a variety of illicit ways, the fairness of the election process. The essence of

those FERs that the District Council complains of is that they take the operation of certain aspects of the election process out of the hands of the current leadership, and place them under the control of the IRO. The IRO concedes that his motivation in drafting rules of this nature was the fear of potential abuses by the current leadership if the conduct of these aspects of the election process were vested in their hands. The District Council argues that such fears are groundless. But the point is that the Government, at the time the Consent Decree was negotiated, was clearly worried about the prospect that the incumbents might use any control over the conduct of the election to mar the fairness of the election in the manner that had been seen historically in the District Council, its locals, and other labor unions in the construction field.

I thus have no doubt that the Government, in agreeing that "supervise" be defined as it is in the Consent Decree, believed it had given the word the broadest possible meaning, necessary to enable the IRO to ensure that the election be a fair one. In response to this, the District Council argues simply that the intent of the parties was that "supervise" be defined as it had been in cases under the LMRDA. While that statement is obviously correct, it is not particularly helpful. When parties to an agreement choose to define a term by reference to something outside of the agreement, they do so for one of two reasons: they believe that whatever is referred to has a clear meaning that will guide a reviewing body in interpreting the term; or, they believe that whatever is referred to has an unclear or uncertain meaning, but the parties agree to take their chances on how the reviewing body will interpret the term.

It is thus wholly insufficient for the District Council to claim simply that the parties intended to define "supervise" as stated. The parties did not choose this definition randomly; in making the choice to define "supervise" as they did, each party believed that this choice would have a particular effect on the eventual meaning that would be given to the term. The District Council has made no attempt to explain what the intentions of

the parties were when this particular definition was chosen. It has not offered any plausible explanation why the Government, given its undeniable fears about the dangers of incumbent involvement in elections, would have consented to a definition of "supervise" that it believed would ultimately yield an interpretation of the term that was either narrow, or unpredictable. Rather, the District Council has chosen to interpret this language in the Consent Decree as if it were a statute, susceptible to any interpretation supported by its plain meaning. The language of the Consent Decree is the most important outward evidence of what the parties agreed to, but it is the discernment of the parties' actual intent that is the function of the Court.

I conclude that, notwithstanding the District Council's present contention, at the time the parties entered into the Consent Decree they intended the definition of "supervise" to be a broad one, encompassing the IRO's actual conduct of certain aspects of the election process, as opposed to mere passive oversight. I base this conclusion on the nature of the events leading up to the Consent Decree, the overall intent and spirit of the Consent Decree, the obvious attempt to incorporate the broad definition embraced by Judge Edelstein, the Government's credible explanation of why this definition was chosen, and the District Council's failure to offer any alternative explanation of the parties' intent. The District Council's current effort to restrict the IRO's election role is no more than a reflection of its dissatisfaction with what he has done.

## The Meaning of Supervise Under the LMRDA

In addition to finding that the parties intended the chosen reference to result in a broad interpretation of the meaning of "supervise", I also find, as Judge Edelstein did, that cases under the LMRDA do in fact give "supervise" the broad meaning intended by the parties.

The enactment of the LMRDA was "the product of congressional concern with widespread abuses of power by union leadership." *Finnegan v. Leu*, 456 U.S. 431, 435, 102 S.Ct. 1867, 1870, 72 L.Ed.2d 239 (1982).

Title IV of the LMRDA was enacted with the goal of insuring free and democratic elections of union officers. *Furniture Moving Drivers v. Crowley,* 467 U.S. 526, 536-7, 104 S.Ct. 2557, 2563-64, 81 L.Ed.2d 457 (1984). Under the statutory scheme, members of a union are endowed with a variety of rights designed to insure that union elections are fair and democratic. LMRDA, § 481. Title IV provides that any union member, after exhausting internal union remedies, may file a complaint with the Secretary of Labor alleging that the conduct of an election violated that member's rights under the statute, or under the constitution or bylaws of the union. LMRDA, § 482(a). The Secretary then must investigate the complaint, and if he finds probable cause to find that an actionable violation has occurred, he can bring an action in the District Court to set aside the invalid election, if any, "and to **direct the conduct of an election or hearing and vote upon the removal of officers under the supervision of the Secretary** and in accordance with the provisions of this subchapter and such rules and regulations as the Secretary may prescribe." (emphasis added) LMRDA, § 482(b).

By itself, this language states only that the Court can order an election to be conducted under the supervision of the Secretary. It does not indicate whether pursuant to its "supervision", the Secretary may actually conduct the ordered election, nor does it state that the union must conduct the ordered election.

In the Teamster's case, Judge Edelstein cited *Donovan v. Illinois Educational Association,* 667 F.2d 638 (7th Cir.1982) in support of the proposition that the Secretary's supervisory powers were broad. In that case, the Secretary of Labor sought to enjoin a union election held pursuant to the union's bylaws, on the ground that one of those bylaws was discriminatory. *Id.* The Court held that an injunction should be granted, since the challenged provision was in violation of the union member's rights. *Id.* at 642.

**9.** *Wirtz v. Local 153,* 389 U.S. 463, 88 S.Ct. 643, 19 L.Ed.2d 705 (1968); *Crowley v. Local No. 82,* 679 F.2d 978 (1st Cir.1982); *Millwrights Local*

The Government cites *Donovan,* as well as another case, *Hodgson v. United Mine Workers of America,* 344 F.Supp. 17 (D.D.C. 1972), in support of its position. In *Hodgson,* the Secretary sought, and was granted, an order voiding an election and "directing the conduct of a new election under the supervision of" the Secretary. *Id.*

Neither of these cases addresses the present issue. As the District Council correctly argues, those cases considered whether the Secretary could obtain an order directing that a particular aspect of a union election be conducted in a certain way. The present dispute is not about whether the IRO can draft rules that insist that every aspect of the election be conducted in a particular way; rather, it is about whether the IRO himself, as opposed to the union leadership, may seize control of the mechanics of running the election. That the IRO may order the union to do something does not necessarily mean that he is empowered to do that thing himself.

The cases cited by the District Council, however, also do not address the present dispute.[9] Those cases simply involved instances where a Court ordered that an election be conducted in the manner suggested by the Secretary of Labor. The District Council argues that in none of these cases did the Secretary actually take over the union's traditional role of running the mechanics of the election, but that factual happenstance is only relevant to the present legal question if the Secretary, in those cases, *sought* such involvement and was denied it.

■ I find that the Secretary's authority to "supervise" an election under the LMRDA would include the authority to take control over the actual mechanics of the election process. I do so based on a consideration of the role played by the Secretary in effectuating the Congressional purpose manifested in the LMRDA.

■ The LMRDA was enacted to further the public interest in free and democratic union elections. *Donovan v. Local 6, Washington Teachers' Union,* 747 F.2d 711 (D.C.

*No. 1914 v. Carroll,* 654 F.2d 548 (9th Cir.1981); *Brennan v. Local 551,* 486 F.2d 6 (7th Cir.1973).

1984). In addition to this general interest in the integrity of elections, Congress sought to "prevent, discourage, and make unprofitable" improper conduct by entrenched union leadership." *Id.*, quoting Senate Report at 5. The cases that have interpreted the Secretary's powers, while not addressing the specific question of whether the Secretary can control the mechanics of the election, have held consistently that the Secretary is empowered take those actions necessary to effectuate the purposes of the LMRDA. *See, e.g., Wirtz v. Bottle Blowers Association,* 389 U.S. 463, 473, 88 S.Ct. 643, 649, 19 L.Ed.2d 705 (1968). This follows naturally from the equitable nature of the Secretary's actions, and the fact that the pursuit of equitable relief requires the authority to invoke flexible remedies tailored to a particular situation. *See, e.g., Donovan,* 747 F.2d at 716, n. 2; *Wirtz,* at 471, n. 10, 88 S.Ct. at 648, n. 10 (quoting the legislative history of the LMRDA: "Remedies for the abuses should be direct . . . [T]he legislation should provide an administrative or judicial remedy appropriate for each specific problem.")

Given the nature of the Secretary's role, I have no doubt that a Court could give the Secretary the power, under the supervisory authority granted in the LMRDA, to wrest control of the mechanics of an election from the incumbents if the Secretary's investigation found such control to be necessary for the conduct of a fair and democratic election. If an election had been run unfairly or undemocratically as a result of the incumbents' control of election mechanics, it is implausible to suggest that Congress would limit the Secretary's remedies to ordering those same incumbents "not to do it again".

That the Secretary can do more than simply obtain court orders directing the union leadership to do certain things was implicitly recognized by the Supreme Court. In *Furniture Moving Drivers,* 467 U.S. at 544, 104 S.Ct. at 2567–68, the Court was confronted with the question of whether an employee could bring a direct action in federal court to remedy LMRDA violations, or whether enforcement by the Secretary of Labor was the exclusive remedy available. In holding that Congress intended that the Secretary of La-

bor be the exclusive vehicle of enforcement of the LMRDA, the Court noted that one of Congress' concerns was the inherent inability of courts to effectively effectuate the purposes of the statute. *Id.* Justice Brennan, in a footnote, cited approvingly the testimony that Professor Archibald Cox had given before the Senate Subcommittee on Labor during consideration of the LMRDA:

"A court is also a clumsy instrument for supervising an election. The judicial process may be suitable for determining the validity of an election which has already been held; but if it is found invalid, or if no election has been held, judges have few facilities for providing an effective remedy. *Merely to order an election might turn the authority to conduct the balloting over to the very same officers whose misconduct gave rise to the litigation.* The court has no tellers, watchers, or similar officials. It would become mired in the details of the electoral process. To appoint a master to supervise the election would delegate the responsibility, but the master would face many of the same problems as the judge. Probably it is the consciousness of these weaknesses that has made judges so reluctant to interfere with union elections, though apparently a few court-conducted elections have been held." *Furniture Moving Drivers,* 467 U.S. at 544, n. 19, 104 S.Ct. at 2567, n. 19. (emphasis added)

Explicit in these comments is the fact that the Secretary of Labor would be *better* at enforcing the terms of the LMRDA then a court would be. Implicit in these comments is the reality that the Secretary must therefore possess capabilities that a Court does not. To limit the Secretary to merely ordering that the union do certain things would render the Secretary's enforcement powers as inadequate as those of a court. Congress would not have made the Secretary the exclusive enforcer of these rights if it meant to limit him to the same remedies already available to courts.

The only argument made by the District Council in support of its narrow reading of "supervise" under the LMRDA is that such a reading furthers the Congressional policy of allowing unions to control their own internal

affairs. That general concern has indeed been embraced by the case law, and the Court recognizes its importance. Nonetheless, the policy of promoting fair and democratic union elections is also an important one, and many of the provisions of the LMRDA strip a union of substantial control over its internal affairs by allowing the Secretary to obtain a court order dictating how elections are to occur. In the face of Congress' clear intent to abrogate union control of internal affairs when such control is believed to have resulted in unfair and undemocratic elections, it is inconceivable that Congress would nonetheless have meant to preserve the union's control over the ministerial tasks of conducting an election, particularly when control of such tasks had been found to have contributed to problems with prior elections. *See Wirtz,* 389 U.S. at 473, 88 S.Ct. at 649 ("... Congress, although committed to minimal intervention [in the internal affairs of a union], was obviously equally committed to making that intervention, once warranted, effective in carrying out the basic aim of Title IV.")

■ Therefore, I find that based on the intent of the parties, and the definition of "supervise" under Title IV of the LMRDA, the IRO's power to "supervise" the District Council election authorizes him to not only draft rules for how the election should be conducted, but to implement those rules by vesting within his own physical control the conduct of the election process. I have reviewed all the FERs, both those to which the District Council objects, as well as those to which it has not voiced any objections. I find that none of them exceeds the authority given to the IRO by the Consent Decree.

### B. Does the IRO Have the Power to Permit Nominated Candidates Access to Members' Names and Addresses?

■ The District Council argues that the IRO has no authority to require the District Council to give nominated candidates the proposed access to the membership list. According to the District Council, LMRDA § 481(c) entitles a union member only to inspect a membership list, not to actually be given the list.

The IRO argues that the Consent Decree gives him the authority to issue such a rule. He cites Paragraph 4(i)(3) of the Consent Decree, which states that the IRO "shall draft rules for the ... dissemination of information about nominated candidates to the membership at union expense." He also cites a decision from the Teamsters case in which the Election Officer was held to have the power sought here by the IRO, based on similar language in the Consent Decree, and the Election Officer's broad supervisory powers. *United States v. International Brotherhood of Teamsters,* 931 F.2d 177, 188 (2d Cir.1991).

The Court finds that the Teamster's decision is right on point. The Second Circuit found that the Teamsters, by entering into the Consent Decree, had given the Election Officer authority beyond that provided by the LMRDA, and that language similar to that put forward here authorized the proposed access to the membership lists. Therefore, as a question of power, I find that the IRO has the authority to permit nominated candidates access to a copy of the membership list.

### III. The Election Rules: Are the Proposed FERs Permissible?

The above findings do not mean, however, that I have approved the FERs. I have only concluded that the Consent Decree permits the IRO to exercise the proposed powers when warranted. I have not yet determined, under the proper standard of review, if the IRO's present exercise of his powers is warranted. The District Council claims that it is not, both with regard to those FERs that seek to place the IRO as the "conductor" of the election, as well as those dealing with a variety of other issues. I will now consider the District Council's objections, as well as my own analysis of the FERs, in deciding whether the proposed FERs are permissible.

[10] Paragraph 6 of the Consent Decree requires that I review the FERs pursuant to the same standard of review employed by courts in reviewing final agency action under the Administrative Procedure Act ("APA"). Under that standard, an FER is permissible

if it is not "arbitrary and capricious." [10] *See, e.g., Farley v. Sullivan,* 983 F.2d 405 (2d Cir.1993); *Randolph–Sheppard Vendors of America, Inc. v. Harris,* 628 F.2d 1364 (D.C. 1980).

As the cases and the APA make clear, the "arbitrary and capricious" standard has both a procedural and substantive component. Procedurally, an agency's decision can be "arbitrary and capricious" if it was not the product of the requisite processes. That is, regardless of the merits of the actual decision, a Court can remand a decision to an agency for further consideration if the agency did not adequately consider all the viewpoints which it was required to consider.

Substantively, the "arbitrary and capricious" standard requires the reviewing Court to reject the findings of the agency if they were not based on consideration of relevant factors, or if there was a clear error of judgment. *See, e.g., Virginia Agr. Growers Ass'n, Inc. v. Donovan,* 774 F.2d 89 (4th Cir.1985); *Darin & Armstrong, Inc. v. U.S. Environmental Protection Agency,* 431 F.Supp. 456 (D.C.Ohio 1976). The Court is not to substitute its own judgment for that of the agency, or in this case, the IRO. *In re Pan American World Airways, Inc. Co-op Retirement Income Plan,* 777 F.Supp. 1179 (S.D.N.Y.1991); *Campbell v. United States Department of Agriculture,* 515 F.Supp. 1239 (D.D.C.1981).

Procedurally, because all of the proposed final rules are the product of the same process, it is possible to evaluate that process globally, without consideration of any particular rule. Procedurally, I find that each and all of the IRO's proposed final rules are not arbitrary or capricious. Unlike the Congressional statutes and rules which typically dictate how an agency is to go about making its decisions, the Consent Decree does not describe or restrict the decision-making and information-gathering processes which the IRO is required to engage in before crafting

the rules. Nonetheless, it is clear that the IRO has engaged in a conscientious, comprehensive, and fair deliberative process, allowing all interested parties to be heard, and that the rules are the product of this effort. I base this conclusion on a number of factors.

First, the draft election rules were sent out to the District Council membership for comment, as required by the Consent Decree. Having read those comments and the IRO's submissions to the Court explaining why he has crafted a particular rule in a particular way, it is readily apparent that the IRO took those comments seriously, and that in those instances when changes recommended by the comments were not adopted, the IRO based such decisions on his view of all the available information.

Second, the IRO has received lengthy and detailed objections from the District Council's current leadership, both orally and in writing. The current leadership, as the representatives of the rank-and-file, have thus had a full opportunity to make their views known to the IRO. The Court is aware of their objections, and it is again apparent from the IRO's submissions to the Court that the IRO took these objections seriously, that he addressed them in a substantive way, and that he took pains to offer reasoned explanations for those instances when he had decided upon a rule against the wishes of the District Council.

Finally, the IRO has gathered information about past District Council and local elections as well as elections held in other labor unions, and he has also consulted with labor lawyers who have been involved with and studied union elections and the problems associated with their fair and democratic conduct. He has also observed first-hand local union elections within the District Council. The IRO has thus also looked beyond the comments of the present leadership and rank-and-file for both general guidance as to the effect of different processes on union

---

**10.** 5 U.S.C. § 706 provides the applicable standard of review. That section reads, in relevant part:

"The reviewing court shall—
... (2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; ...
(D) without observance of procedure required by law;"

elections, and as to those rules that would be most effective with regard to this particular election.

Thus, it is indisputable, and I am not aware of any protests of the District Council to the contrary, that the IRO has engaged in a conscientious, comprehensive, and fair deliberative process in crafting the FERs, and that all interested parties have had an opportunity to be heard, and have had their comments considered in a serious way. I thus conclude that the IRO has satisfied the procedural component of the "arbitrary and capricious" standard of review under the APA.

As to the substantive component of the "arbitrary and capricious standard", I will consider each of the objections of the District Council and others separately.[11]

### A. The IRO's "Conduct" of the Election

I have already held that it is within the IRO's power under the Consent Decree to actually seize control of the mechanics of the upcoming election in the manner contemplated by the FERs. I will now address the District Council's contention that the IRO's "conduct" of the election is injudicious.

The District Council makes the following general objections to those rules in which the IRO "conducts" the election: (1) It sends a message to the membership that the current officers cannot be trusted to run a fair election; (2) The IRO is "posturing, posing, and grandstanding"; (3) The IRO seeks to move as many possible functions over to his staff so that he may enhance the financial position of his firm; (4) The election rules were meant to guide and prepare the District Council to conduct future elections, but will not do so, if the IRO does everything himself; (5) There is no history of corruption or intimidation in District Council elections, and the only suggestion of such a climate, detailed in

the IRO's Interim Report of October 4, 1994, was based on hearsay and innuendo, and motivated by the IRO's anti-incumbent bias.

The IRO has justified his more intrusive role by arguing the following: The District Council does not have a strong tradition of democratic leadership, and has never held an election wherein the rank-and-file membership directly elected the leadership. The complaint in the civil RICO action alleged various acts of corruption, fraud, and violence, and the IRO contends that his staff's own observations of last summer's local union elections confirmed the view that incumbents often use their positions to "manipulate the system" and that the opposition is targeted for intimidation and economic reprisal. Whether or not the present incumbents have committed or are likely to commit such acts, there is a perception among the membership that the potential for adverse consequences as a result of opposing the incumbents is real, such that a free and fair democratic election will be impeded.

I find that the IRO's decision to seize control of certain mechanics of the election is not arbitrary or capricious. The IRO's contention that there is, at the least, a perception among the membership that the incumbents will use their position to exact retribution on those who oppose them appears well-founded in the allegations detailed in the IRO's Interim Reports to the Court, as well as in the comments made to the IRO by the membership regarding the election rules. The District Council argues that the IRO's allegations in the interim report are based on hearsay and innuendo, but it is not this Court's job to decide questions of credibility or the reliability of evidence. It was not arbitrary or capricious of the IRO to credit the information he gathered, nor to use that information as the basis for giving himself a more active role in the election process.

---

11. In its letter to the Court dated March 30, 1995, the District Council noted that: "In the interests of having the election actually conducted in June, not in July of 1995, as proposed by the IRO, the District Council would withdraw all other objections to the IRO's proposed election rules, except those concerning the method of balloting and the month of June for voting." I have nonetheless considered those "other objec-tions", for two reasons: (1) It is unclear if the offer to withdraw these objections is conditioned upon the Court ruling in the District Council's favor on the date of the election and the method of balloting; (2) The objections raise some legitimate concerns and warrant serious judicial scrutiny; and (3) To the extent that the withdrawal was offered in exchange for a prompt decision by this Court, no such offer was necessary.

That is the short conclusion. But it is appropriate to say more about certain of the District Council's objections, specifically, those contending that the IRO's findings are the product of bias or unreliable information. The following statement in the IRO's letter is a useful starting point. In regard to the allegations of retaliation against union members who oppose incumbents, the IRO notes that: "If the victims of this retaliation are ultimately unwilling to come forward and cooperate with my office because of the fear of future retaliation, this only serves to strengthen my conclusions." The nature of this statement reveals much about this case. As this statement reflects, the IRO has to some extent, both in drafting the rules and in his overall approach to his responsibilities, been required to rely not only on information that his office has gathered, but on reasoned assumptions and conclusions regarding the past and current state of affairs in the union. Indeed, the statement quoted above is an instance where the IRO expresses the belief that the *absence* of available evidence on a particular point proves that very point.

The District Council leadership is understandably upset that the IRO's decisions about the election are based in part on such assumptions and conclusions, particularly because they themselves are the subject of those allegations. But that is a necessary and proper exercise of the IRO's authority, given the context in which the Consent Decree arose, the significance of the IRO's appointment, and the purpose served by the IRO's supervision of the election process.

■ As noted earlier, the government's civil RICO complaint alleged a number of very serious charges against past and present officers of the District Council regarding corruption and violence at the union. While many of those named in the complaint pleaded guilty, two of the current officers, and the District Council itself, settled the charges against them by entering into the Consent

Decree. Pursuant to that Consent Decree the IRO was appointed to investigate and "clean up" the union, and was given broad powers with which to perform that task. It was the purpose of the Consent Decree that all the involved parties would share the common goal of insuring that the District Council was free from the types of problems alleged in the original complaint.

The District Council leadership, however, has essentially taken the position in this dispute, as well as in others involving the IRO, that this history is not to be considered by either the IRO or the Court, and that every action taken must be based on reliable and credible information proven as such in a court of law or meeting some similarly high standard. That cramped view of the IRO's latitude is simply at odds with the Consent Decree. The IRO is not a prosecutor, nor is he the District Council's adversary. Rather, he was selected by the parties to the Consent Decree as a neutral party, entrusted by them to carry out its mission. The IRO was not imposed upon the District Council, but rather was voluntarily accepted by it in furtherance of the professed goal of ridding the union of any corrupt influence.

Therefore, I think the Consent Decree properly invests the IRO with a certain presumption of trustworthiness, as well as a presumption that his actions and recommendations are made in good faith. This does not mean that the Court in any way intends to abdicate its supervisory responsibility over the Consent Decree or that the IRO's actions are not subject to review under the "arbitrary and capricious" standard. It does mean, however, that in deciding whether the IRO's decisions are arbitrary or capricious, the presumption of trust and good faith embodied in the parties' agreed-to selection of this IRO must entitle the IRO to some latitude in basing decisions upon his own perceptions, conclusions, and assertions regarding the information he has received.[12] It was

12. In his first Interim Report to the Court, at page 6, the IRO notes that his office has received hundreds of phone calls from the membership, many of them anonymous, complaining about union corruption. Information sources of this nature were to be expected by the parties given the problems that gave rise to the Consent De-

cree. The District Council's position that the IRO should not be entitled to act on such information until it is corroborated and proven credible would severely limit the ability of the IRO to pursue the goals of the Consent Decree. Rather, the voluntary selection of the IRO by both parties must be viewed as a statement that the individual

not the purpose of the Consent Decree that every action taken by the IRO would be fought in Court and that the credibility and trustworthiness of the IRO would need to be established anew with regard to every contemplated action.

The Court recognizes that such a presumption may have the effect of limiting the current leadership's control of the affairs of the union. The District Council, however, voluntarily gave up a substantial measure of its autonomy when it entered into the Consent Decree, and whatever concerns it had that the IRO would act in bad faith or be biased should largely have been dissipated by the parties' voluntary agreed-to selection of the individual whom who presently occupies the position.

█ As the monitor of the Consent Decree, the Court is responsible for ensuring that the IRO performs his job in good faith, and the Court takes this responsibility seriously. Thus far, there has been no indication whatsoever that the IRO has not performed his responsibilities competently, conscientiously, and in good faith. The District Council leadership continuously protests that the IRO is grandstanding and has a clear anti-incumbent bias, but there is simply no evidence of that. The Consent Decree makes clear those motives which should properly inspire the action of the IRO. The reality is that, whether true or not, the IRO believes the present incumbents to be supporters and facilitators of practices that are

at odds with the goals and purposes of a free and democratic union.[13] In entering into the Consent Decree, the present leadership undoubtedly recognized that the IRO's investigatory sights might conceivably be turned upon them. If the IRO believes that the present leadership acts in such a way as to hinder the development of a free and democratic union, he is obligated to act upon that belief, and there is nothing improper about such a motivation.[14]

█ This is not changed by the contention that the membership will infer from the IRO's action that the current leadership is corrupt. The Consent Decree is for the benefit of the members of the District Council, not for its leadership, and if the IRO believes the membership will benefit from rules that remove control of the election from the hands of the incumbents, it is his obligation to draft them so as to confer that benefit.

There is also no evidence that the IRO is grandstanding or seeking control of the union for his own personal aggrandizement. The IRO was selected because of his independence, and the Court cannot discern anything to be gained by the IRO from the types of actions of which the District Council complains. None of the actions taken by the IRO has been outside the bounds of the Consent Decree. The issue, again, is that the IRO has turned his sights upon the current leadership based on what he believes to be the current state of affairs in the union. That the leadership is understandably unhap-

chosen could be trusted to not fabricate such sources.

13. I note, because the District Council continuously argues that the allegations are groundless, that the IRO has not come to this belief by mere chance. The complaint filed by the Government charged certain of the current officers with serious crimes, and while nothing was admitted or denied as a matter of law, the IRO is certainly entitled to consider the significance of those charges. The IRO has also submitted to the Court as part of his Second Interim Report the sworn declaration of Salvatore Gravano, a former member of the Gambino Organized Crime Family, describing the influence of the Columbo crime family over one of the current District Council officers. The District Council leadership contests the truth of these charges and they are entitled to do so. I express no view on their merits. The IRO, however, does not seek to

prosecute the District Council leadership based on such information, but only to bring about an election that is fair and democratic. Surely no dispassionate observer could argue that it is unwarranted for the IRO to adopt a precautionary stance based on the information available to him.

14. In addition, though the current leadership vehemently denies the validity of such allegations, it cannot be disputed that the FERs serve a prophylactic purpose, drafted so as to ensure that the election will be democratic and fair even though some person or persons might be inclined to engage in subversion. The District Council leadership has professed adherence to the desirability of a democratic and fair election, and the FERs further that goal. Thus, the District Council should have no objection to the fact that the FERs incorporate precautions against subversion of the election process.

py with this attention does not mean that the IRO is on a personal crusade, for the Consent Decree requires him to take such action when he believes it will further the goals of the Consent Decree.[15]

The above analysis is meant to address the District Council's objections regarding the IRO's alleged "personal aggrandizement", his alleged bias, and the nature of the information upon which the IRO has based his decisions. I will now address the two other concerns raised by the District Council.

■ With regard to the claim that the Consent Decree was meant to teach the District Council how to conduct a fair and free election on its own, surely the conduct of the ministerial tasks of the election is not the critical step in insuring a free and fair election. Presuming a neutral leadership, it is the content of the election rules and individual compliance with them that is critical to a fair and free election, not the actual mechanics of the election process. It is true that the IRO's proposed role for himself will become established as part of the union bylaws pursuant to the Consent Decree, but the rules can easily be changed after the election.[16] In any event, it is certainly not arbitrary or capricious for the IRO to have concluded that the benefits of seizing control of the conduct of the election outweighed any detriment from depriving the present District Council leadership of practical experience in the mechanics of an election.

■ Finally, the District Council argues that the IRO is motivated in part by a desire to increase the fees of his law firm. Under the Consent Decree, the IRO is paid a fixed fee of $65,000 every month. That fee is capped, and the IRO is entitled to that payment and that payment only, regardless of how much additional work is performed. The Consent Decree explicitly provides that this monthly fee includes charges for any

time spent by the IRO in supervising the election. ¶ 7. Under no circumstances, then, would the District Council be obligated to pay the IRO greater fees because of the IRO's additional work, and indeed, given the District Council's complaints with regard to other rules that its own resources are being depleted, it would presumably welcome relief from further obligations. In any event, there is absolutely no evidence that the FERs were motivated by the IRO's personal financial concerns.

**B. The FERs Do Not Make Allowance for Unopposed Candidacies**

■ The District Council argues that candidates for local elections often run unopposed, and that in order to reduce costs, the FERs should provide that certain steps now proposed by the FERs need not be taken in the event a candidate runs unopposed. The IRO concluded that the procedures should be applicable to both opposed and unopposed elections.

I find that the IRO's decision is not arbitrary or capricious. The District Council cites certain costs associated with unopposed candidacies that could be avoided, such as the mailing and tabulating of the ballots. But ballots must be mailed out anyway, and tabulation of an uncontested election would presumably not be very difficult or costly. The suggestion that the IRO is seeking to increase his workload in what it is claimed will be a slow month was addressed above and was found to have no merit. In weighing the value of uniform rules against potential additional costs, I cannot say that the IRO's decision was arbitrary or capricious.

**C. Nominated Candidates Should Not Have Access to a Copy of the Membership List.**

■ This issue was addressed earlier in the context of the IRO's power to require the District Council to provide nominated candi-

---

**15.** The District Council suggests that the IRO's failure to bring charges against those individuals implicated in the relied-upon allegations reflects the fact that the IRO's motivation is personal, and not based on a belief in the truth of those allegations. The Consent Decree, however, gives the IRO wide discretion in determining when and against whom charges should be brought, and thus the absence of charges filed against

these individuals is not probative of any improper motive.

**16.** The IRO expressly recognizes the transitional role of the proposed rules, and there is no suggestion that the IRO intends to perpetuate his own role in elections beyond that called for by the Consent Decree.

dates with a copy of the membership list. The District Council also argues that the rule is unwise. Their main argument relates to privacy and confidentiality: they contend that the names and addresses of union members are valuable commercially, and that there are inadequate safeguards preventing the information from reaching the wrong hands. They also argue that the privacy rights of members will be violated if they are subjected to unwanted contacts by candidates.

The IRO contends that access to the lists is essential to insure that each candidate be accorded an equal opportunity to campaign by phone, which it is contended is the most effective way of campaigning. He also contends that there are several safeguards preventing misuse of the list. These include: a rule requiring those seeking the list to sign an affidavit stating that they will not use it for any purpose other than campaigning; a rule subjecting a member to discipline for misuse of the list; lists must be returned to the IRO at the end of the election; and, at the urging of the District Council, the list given to candidates will include names and addresses, but not phone numbers.

The Court finds that the IRO's decision to give nominated candidates copies of the membership list is not arbitrary or capricious. The incumbents already have such access, and providing opposing candidates with similar access seems only fair. While the safeguards on confidentiality and privacy are not perfect, the IRO has decided that whatever detriments result from the possible invasions of privacy and the increased likelihood of improper access to the list are outweighed by the benefits of enabling all candidates to reach out personally to the entire membership. I cannot conclude that that balancing of concerns was arbitrary or capricious.[17]

### D. The IRO's Rules For Disseminating Candidates' Statements Are Excessively Costly

The FERs require that all nominated candidates be allowed to print campaign material in two special election editions of *The Carpenter*, and that the District Council, at its own expense, provide for the distribution of one 8.5 × 11 piece of campaign literature to be mailed together with similar material from any other candidate. FER 5(A). The District Council argues that the costs of such mailings are unaffordable and punitive, and that they are an unprecedented shifting of the costs of campaigning from the candidate to the union.

The IRO argues that pursuant to Paragraph 4(i)(3) of the Consent Decree, he is empowered to "draft rules for the ... dissemination of information about nominated candidates at union expense." He further argues that the proposed mailings at union expense are necessary to help candidates mount an effective campaign, given the already prohibitive costs of campaigning in a union with a large and widespread membership. Finally, he argues that the costs are not excessive, and that the District Council has not explained why it cannot bear this cost, or what cost, in fact, it is willing to bear.

I find that the IRO's proposed rules in this area are not arbitrary or capricious. The Consent Decree clearly states that the cost of the dissemination of information is to be at union expense, so that it is futile to argue that such a system is not traditional. In addition, while the Consent Decree explicitly empowers the IRO to draft rules for the dissemination of information, and to seek a fair and democratic election, the Consent Decree contains no language limiting the amount of the expenses that could be dedicated toward these goals. While I am not prepared to say that the IRO could impose any expense he desired upon the District Council, the amounts proposed here do not appear disproportionate, given the valid objective that is sought. Indeed, the IRO changed the draft rules to include in the final rules a provision that in sending out campaign literature, only black ink is to be used,

---

17. The District Council suggests a variety of additional safeguards that it claims would reduce the risk of misuse of the lists, and protect members' privacy. The Court's task in reviewing the rules, however, is not to choose among competing suggestions, but only to decide if the IRO's decisions satisfy the standard of review.

a gesture that will reduce the overall costs of the mailing. Given the valid objective being pursued by the IRO, and the lack of a limitation on the expenses allowable in pursuit of such an objective, I cannot conclude that the rules for dissemination of information to the membership are arbitrary or capricious.

### E. Candidates' Campaign Literature Should Be Limited to Basic Biographical Information

 The FERs allow nominated candidates to include in the literature to be mailed out on their behalf solicitations for campaign funds, as well as any promotional information about their candidacy that they wish the membership to have. The District Council contends that candidates should be limited to providing basic biographical information only, i.e., years of membership, local affiliation, prior experience in union office, age, work history, educational background, and other relevant biographical information. It bases its arguments on a concern for the cost of mailing the additional information, and the potential for District Council liability resulting from the statements printed in *The Carpenter*.

The IRO contends that he is authorized to disseminate "information about a candidate", and that campaign literature and solicitations are obviously included in the type of "information" that was envisioned by the Consent Decree.

I find that the IRO's decision in this area is not arbitrary or capricious. The very purpose of disseminating candidate information to the membership is to subsidize the costs of a campaign, and that purpose would be thwarted if candidates were forbidden from providing politically-oriented information about their candidacies. Surely it cannot be contended that elections of District Council officers turn on a candidate's age, place of birth, and educational experience. Rather, they are fiercely political contests, wherein candidates engage in the same type of politicking as that seen in governmental elections. Such politicking is consistent with and

indeed necessary to a fair and democratic union, and the IRO's rules in this area further that goal.

 As to the District Council's potential liability for the content of the candidates' statements, the District Council has not cited to any case law describing the legal implications of a union's publication of a member's statement in its newspaper. The Court notes the broad legal protection given for statements expressing an opinion, for statements made for political purposes, and for letters or opinions published by newspapers, and in the absence of any authority to the contrary cited by the District Council, cannot conclude that the asserted problem is a serious one. In any event, the incumbents routinely have access to *The Carpenter*, and the IRO has determined that the benefits of equal access outweigh the specter of meritorious libel suits against the District Council. I cannot say that that choice is arbitrary or capricious.

### F. The FERs Are Too Lengthy and Complex

 The District Council contends that the FERs are too complicated and difficult to understand, and that candidates will need to expend large amounts of time and money to hire consultants to assist them in navigating the rules.[18] They ask that the IRO simplify and shorten the FERs.

The Consent Decree contains no restrictions on the length or nature of the election rules. In addition, given the import of the task and the difficulty in achieving the goal, the FERs inevitably require some detail and complexity. I cannot say that this general aspect of the FERs is arbitrary or capricious.

### G. Ballot Positions Should Not Be Determined By Lot

 The FERs provide that slots on the ballot are to be determined by lot. FER 2(E). The District Council argues that slates of candidates should appear first on the ballot, followed by unaffiliated candidates, be-

18. As noted earlier, however, the District Council argues vehemently against postponing the election date, despite the contention of the opponents of a June election that there will not be enough time for non-incumbents to satisfy the FERs and mount a meaningful campaign.

cause members will be confused by "a ballot having a first column with a single candidate and subsequent columns with candidates for each position."

The IRO's decision here is not arbitrary or capricious. Ballot position is well-known to exert an influence on voters, and it is entirely proper that such positioning be determined randomly. The asserted confusion from this system appears wholly speculative, and it was not arbitrary or capricious for the IRO to determine that random placement is preferable.

### H. Candidates Should Be Able to Inspect Nominating Petitions

██ The FERs provide that nominating petitions are to be provided to the IRO, where they will be kept confidential and be unavailable for inspection. FERs 2(B)(1), 2(B)(2). The IRO contends that nominating petitions have never before been employed in a District Council election, and that the IRO's office has received comments suggesting that many members will be reluctant to sign petitions of opposing candidates because of fear of economic reprisals, either by incumbents prior to the election, or by the eventual winners. Therefore, the IRO believes it necessary to keep the petitions confidential.

The District Council argues that no fear of reprisals is justified, given the FER that provides that "a member does not endorse a prospective candidate by signing his or her petition," and "is not obligated in any way to support, or to vote for, a candidate whose petition he or she has signed." They argue that candidates must be able to inspect the nominating petitions of other candidates in order to ensure their legitimacy. They also argue that the District Council should be able to review at least the "best" [19] 125 qualifying signatures of every candidate in order to determine if the cost of a contested election is warranted.

As to the District Council's first contention, that the rule it cites will prevent reprisals, that is simply disingenuous; an individ-

ual inclined to engage in reprisals is unlikely to be deterred by the FER's disclaimer. As to its third contention, I have already ruled that the FERs may properly fail to make special provision for uncontested elections.

As to the second contention, that members have a right to ensure that the petitions of opposing candidates satisfy the rules, that right will be vindicated by the IRO. The IRO believes that allowing access to nominating petitions will either result in economic reprisals against those who sign an opposing candidate's petition, or deter individuals from signing petitions in the first place. The District Council contends that such fears are unwarranted, but warranted or not, it seems judicious to protect against that eventuality, particularly when a neutral party, voluntarily agreed to by the parties to the Consent Decree, will be able to ensure that nominating petitions satisfy the rules. I therefore cannot conclude that the IRO's rules in this area are arbitrary or capricious.

### I. Local Unions Should Be Allowed To Endorse Candidates

██ The FERs provide that a local union may not endorse a candidate, even if all members agree on the endorsement or candidacy. FER 3(7)(B). The District Council contends that such endorsements are a traditional union function that serves to assist politically inactive members in determining who to vote for. The IRO believes that such endorsements may be coerced, and therefore may exert an improper influence on the decisions of members.

I cannot conclude that this rule is arbitrary or capricious. As noted earlier, it appears judicious to protect against any eventuality that could corrupt the election process, and the interest of politically inactive members in a formal endorsement by the local union, while not completely insignificant, does not appear particularly weighty. All members are obviously free to speak amongst themselves regarding the election, and any member seeking guidance can obtain

---

19. The District Council does not offer an explanation of what criteria would be used in deter-

mining what the "best" signatures were.

it informally from his or her fellow union members. I cannot say that this rule is arbitrary or capricious.

## J. The Election Should Not Include the Second Vice–President

■ The FERs provide for the election of a President, a First Vice–President, a Second Vice–President, a Secretary/Treasurer, and the Chairman of the Trustees. FER 1(2). The District Council argues that the Second Vice–President's position is presently not filled because of financial considerations, and that the upcoming election should not include this position.[20]

The IRO argues that the District Council By-laws include the Second Vice–President as a member of the Executive Board, and that the fact that the last individual to hold this position resigned in 1991 does not mean that the position has been eliminated. The IRO contends that the decision to include the Second Vice–President is required by the Consent Decree.

I agree. The By-laws include the Second Vice–President as a member of the Executive Board, and the Consent Decree provides that an election of the Executive Board is to be held. The Second Vice–President, thus, must be included.[21]

## K. Balloting Should Be By Mail Only

■ The FERs propose a hybrid balloting system: all members living within a 75–mile radius of New York City will be required to vote in person at a neutral polling sight somewhere in New York City. FER 5(1)(A). All members living outside of this 75–mile area may vote by mail ballot. FER 5(1)(B).

The IRO explains that his decision to require in-person voting within the 75–mile radius is prompted by concerns about the potential for corruption in a mail ballot election. He also notes that the evidence regarding the likelihood that different balloting methods will produce different turnout levels is equivocal.

The District Council argues that all voting should be conducted by a mail ballot. They argue that mail balloting will produce a higher response than in-person voting, and that many of the members living within the 75–mile area are old and will be unable or unwilling to make the trip to the polling site. They also argue that the Consent Decree essentially requires an all mail balloting election, given its direction that "[t]he method or methods chosen for casting ballots shall seek to ensure that those eligible members who reside outside of the New York metropolitan area are able to vote." ¶ 4(i)(3). Finally, the District Council argues that there is no evidence that a mail ballot election will be subject to corruption, and that the IRO has failed to produce any credible evidence of such corruption in past mail ballot elections.

I find that the balloting method chosen by the IRO is not arbitrary or capricious. First, as to the language of the Consent Decree, I read the direction that the FERs "seek to ensure" that members living outside the Metropolitan area have an opportunity to vote not as an absolute requirement that the balloting method chosen make this the overriding goal, but as an expression of the parties that this segment of the membership be given full consideration by the IRO. Wheth-

---

**20.** The District Council had earlier taken the position that the Consent Decree provides for the election of the Executive "Board" and that the Chairman of the Trustees is a member of the Executive "Committee" rather than the Executive "Board". Without waiving its argument, the District Council withdrew its objection to the inclusion of the Chairman of the Trustees in the upcoming election. The District Council was unclear, however, whether it was also withdrawing its objection to the inclusion of the Second Vice–President, so I will address that on the merits.

**21.** The Court has also received a letter from one member of the District Council complaining that the FERs violate the Consent Decree by not providing for the election of all District Council officers. This member cites Paragraph 4(a) of the Consent Decree, which states that the IRO is to "supervise the 1995 District Council elections." That provision, however, is a statement of the IRO's general authority. Paragraph 4(i)(1) is the IRO's specific authority, and it provides that the IRO shall supervise a secret ballot election of the District Council *Executive Board.* The FERs provide for the election of all the members of that entity, and they properly do not relate to officers who are not members of the Board.

er or not a mail ballot is most convenient for these members, the Consent Decree does not require a mail ballot for members living outside of the metropolitan area. A large percentage of those members living outside of the metropolitan area are undoubtedly the inactive and retired members of the union, and the Consent Decree reflects that the status of these members should not be taken as a sign that their participation is unimportant.

This concern notwithstanding, it is obvious that an election free from corruption is essential to fulfilling the goals of the Consent Decree. The Consent Decree requires the IRO to draft rules that give fair consideration to this segment of the membership, but such consideration should not detract from the other important goals of the election. Widespread turnout will be of little value if the balloting process is corrupted. It is clear that the IRO has considered this segment of the membership, as evidenced by the fact that despite his concerns about corruption in mail balloting, those living outside of 75 miles may vote in that manner.[22]

Second, the evidence regarding voter participation is not clear. The District Council cites a recent local union election wherein a mail ballot was used and participation was purportedly quite high. The IRO, however, notes that other mail ballot elections have not been so successful, and that in-person voting can produce a higher turnout rate than a mail ballot. In the IRO's view, the hybrid method chosen will maximize participation. Given that the evidence is equivocal, I cannot say that the IRO's choice was arbitrary or capricious.

Finally, as to the claim that there is no evidence suggesting a likelihood of corruption in a mail ballot election, I have already discussed above my view of questions regarding the credibility of the IRO's information.

Whether the information received by the IRO is credible or not[23], it is surely wise in drafting rules for a free and democratic election to take into account the possibility of such corruption occurring, and to craft the rules accordingly. The District Council's position is essentially that each rule is a burden upon the union unless shown to be *absolutely necessary* for a free and fair election. That narrow view makes no room for rules which are crafted with the goal of avoiding harms which are at the very least possibilities. The District Council, however, has professed its adherence to the goals of the Consent Decree, and if that adherence is genuine, there can be no quibbling with precautionary rules designed to prevent not only known ills, but possible ones as well.

The various balloting methods available for the election each appear to have their strengths and weaknesses. The IRO concedes this, and acknowledges that his own view of the subject has evolved as he has learned more. He has explained that he has chosen the hybrid method over other options because he believes it is most likely to produce the optimal combination of high participation and minimal corruption. It is not this Court's responsibility as a reviewing body to decide which method it would have chosen were it the IRO. All I am required to do is to decide if the IRO's decision is arbitrary or capricious, and I find that it is not.

\* \* \*

For all of the above reasons, I approve the FERs proposed by the IRO. The timing of the election shall be that set forth by the IRO in the FERs.

SO ORDERED.

---

**22.** In some of his earlier comments to the Court, the IRO had considered an all-mail ballot, as well as requiring those within 100 miles of the Metropolitan Area to vote in-person.

**23.** The Court notes that the corruption cited by the IRO is not based on mere conjecture. The IRO received a lengthy letter from Local 608 describing the ease with which mail ballot elections can be corrupted, and alleging that current District Council officers have engaged in such corrupt practices. The IRO also discovered that

such corruption had occurred in mail ballot elections in other New York construction unions. The District Council vehemently denies the charges made by Local 608, and asserts that Local 608's leadership is politically motivated, and will benefit from the low turnout outside the metropolitan area likely to result from an in-person election. It is the IRO, however, and not this Court, who is empowered to make credibility determinations.