**State of MAINE, Plaintiff,**

v.

**Donna SHALALA, et al., Defendants.**

**Civil No. 98–139–B–C.**

United States District Court, D. Maine.

Nov. 29, 1999.

---

Francis E. Ackerman, AAG, Office of Attorney General, Augusta, ME, for plaintiff.

James M. Moore, AUSA, U.S. Attorneys Office, Bangor, ME, Lisa A. Olson, Sheila M. Lieber, U.S. Department of Justice, Washington, DC, for defendant.

## MEMORANDUM OF DECISION AND ORDER

GENE CARTER, District Judge.

Currently before the Court are cross-motions for summary judgment. Plaintiff filed its Motion for Summary Judgment (Docket No. 8) ("Plaintiff's Motion") on February 12, 1999, while Defendants filed their Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment (Docket No. 12) ("Defendants' Motion") on March 8, 1999. After both Motions had been fully briefed, including supplemental memorandums of law from both parties, United States District Judge Morton A. Brody recused himself from this matter and it was reassigned to this Court. Pursuant to the Administrative Procedures Act, 5 U.S.C. §§ 701–706, Plaintiff, by its Complaint (Docket No. 1), seeks judicial review of a final decision of the Department Appeals Board ("the Board") of the United States Department of Health & Human Services ("DHHS"). Because there are no genuine issues of material fact, and because the decision of the Board was not arbitrary or capricious, Plaintiff's Motion will be denied and Defendants' Motion will be granted.

## I. BACKGROUND

The Court begins by noting that there are no factual disputes between the parties. As Plaintiff seeks review of the Board's final Decision Number 1659 ("the Decision"), the Court will cite whenever possible to the extensive record developed before the Board.

The Maine State Retirement System ("MSRS") is an actuarially funded pension system created by the Maine Legislature in 1942. Decision at 4. The MSRS provides retirement benefits to state and municipal employees and their beneficiaries. *Id.* The MSRS is funded by employee contributions as well as contributions from the state and federal governments. *Id.* at 4–5. Federal contributions are directly linked to amounts contributed by the state and reflect the work performed by state employees on federally funded programs. *Id.* at 5.

In 1947, a group of teachers that began work prior to 1924 were incorporated into the MSRS. *Id.* at 7. These teachers had previously participated in a noncontributory retirement plan, and they were accordingly known as the "Old System Teachers." *Id.* As the Old System Teachers began to retire in the 1950s and 1960s, the MSRS experienced shortfalls. *Id.* In 1982

the Maine Legislature finally addressed the resulting unfunded liability by authorizing a series of supplemental payments to the MSRS over and above the contributions made relative to the then-current state employees. *Id.* For each year between 1982 through 1993, the State of Maine made supplemental payments of between $12 million and $30 million to the MSRS in an effort that finally erased the deficit that had resulted from the addition of the Old System Teachers to the MSRS. *Id.* At the time these supplemental payments were being made, Maine never sought additional contributions from the federal government to correspond with the increased State contribution. *Id.*

During a budgetary crisis in fiscal years 1992 and 1993, the Maine Legislature "deappropriated" funds that had been earmarked for the MSRS as part of normal contributions and used those funds to meet the budget shortfalls. *Id.* at 5. Maine apparently did not report this change in contributions to the federal government. *Id.* Instead, Maine continued to claim a federal contribution that corresponded to the State appropriation that, in fact, was never contributed by the state to the MSRS. *Id.* An audit eventually revealed that the federal government overpaid $4,660,169 in fiscal year 1992 and $1,430,-408 in fiscal year 1993.[1] *Id.* DHHS now seeks repayment of $6,090,577 plus interest from Maine for the improper federal contributions to the MSRS during fiscal years 1992 and 1993. *Id.* at 1.

Maine does not challenge that it owes the $6,090,577. *Id.* But the State has argued that it is now entitled to reduce the amount owed to the federal government by the money that the federal government should have paid into the MSRS to match the supplemental contributions made by the State between 1982 and 1993. *Id.*

Maine now calculates that the federal government should have contributed $2,891,-005 to the MSRS to reflect the supplemental contributions made by the State. Plaintiff's Statement of Material Facts at 3 (Docket No. 9). Plaintiff pursued this offset argument up the chain of command at DHHS until its position was finally rejected by the Board on May 4, 1998. Decision at 20.

By this action, Plaintiff seeks review of the Board's rejection of Plaintiff's offset argument. Additionally, Plaintiff is challenging the interest rate used by DHHS to calculate the total currently owed by the state as a result of the improper federal contributions in fiscal years 1992 and 1993.

## II. STANDARD OF REVIEW

### A. Summary Judgment

Summary judgment is appropriate when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). Once the moving party has come forward identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any" which "it believes demonstrate the absence of a genuine issue of material fact," the adverse party may avoid summary judgment only by providing properly supported evidence of disputed material facts that would require trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2551–52, 91 L.Ed.2d 265 (1986).

The trial court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." *Griggs–Ryan v. Smith,*

---

1. The fiscal year 1992 amount was originally calculated at $5,563,362 but was later reduced to $4,660,169 by the DHHS Regional Director to reflect a partial offset resulting from the supplemental contributions to the MSRS by the state between 1982 and 1993.

The Board characterized this offset as an effort to settle the dispute, and the Board did not believe it was bound by the Regional Director's legal basis for this offset. Decision at 16–17.

904 F.2d 112, 115 (1st Cir.1990). The court will not, however, pay heed to "conclusory allegations, improbable inferences [or] unsupported speculation." *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990). The role of the trial judge at the summary judgment stage "is not ... to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

## B. Administrative Procedures Act

This cause of action reaches this Court under the Administrative Procedures Act ("APA"); 5 U.S.C. § 701 *et. seq.* In reviewing a final agency decision under the APA, the court shall "set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The Court of Appeals for the First Circuit has expounded on this standard as follows:

> Because the APA standard affords great deference to agency decisionmaking and because the Secretary's action is presumed valid, judicial review, even at the summary judgment stage, is narrow....
> An agency rule is arbitrary and capricious if the agency lacks a rational basis for adopting it—for example, if the agency relied on improper factors, failed to consider pertinent aspects of the problem, offered a rationale contradicting the evidence before it, or reached a conclusion so implausible that it cannot be attributed to a difference of opinion or the application of agency expertise.

*Associated Fisheries of Maine v. Daley*, 127 F.3d 104, 109 (1st Cir.1997) (internal citations omitted). Additionally, the First Circuit has noted that an agency decision should be upheld "so long as [it does] not collide directly with substantive statutory commands and so long as procedural corners are squarely turned." *Adams v. United States Envtl. Protection Agency*, 38 F.3d 43, 49 (1st Cir.1994) (internal citations and quotations omitted). Furthermore, any actions based on statutory interpretation by the agency shall not be disturbed so long as the interpretation is reasonable. *Chevron U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

The Court understands the law to be well-established that so long as the agency provided one rational basis for its action that meets the requirements of the APA, this Court shall not disturb the underlying agency action. Having said that, it is also a well-settled rule of law that the agency must have provided a valid basis for its action at the time the action was taken. Neither the reviewing court nor the agency may provide a novel basis for the action that satisfies the arbitrary and capricious standard set forth in the APA. *Gulf States Utils. Co. v. Federal Power Comm'n*, 411 U.S. 747, 764, 93 S.Ct. 1870, 1880, 36 L.Ed.2d 635 (1973) (court cannot provide a novel basis for agency action); *American Iron & Steel Inst. v. Envtl Protection Agency*, 568 F.2d 284, 296 (3d Cir. 1977) (agency "post hoc rationalizations" not considered in APA review). Accordingly, a plaintiff may prevail only by demonstrating that each basis offered by the agency for its action is arbitrary or capricious, and a defendant may not defend its underlying action with theories not first enumerated by the below.

## III. DISCUSSION

### A. The Board's Decision

As indicated above, there are no genuine issues of material fact. Furthermore, there is no dispute that the Board's Decision represents a final agency action suitable for review by this Court under the APA. Bearing in mind this narrow standard of review afforded by the APA, this Court will begin with a brief recitation of the grounds upon which the Board denied Maine's request for an offset.

The Board began its analysis of Maine's claim for an offset by pointing out that Maine had not established that the federal government had a debt to Maine capable of being used as an offset. Decision at 8. The Board noted that Maine never filed a claim for reimbursement to correspond with the supplemental payments the State made to the MSRS between 1982 and 1993. *Id.* The Board then pointed out that even if the State had filed a timely claim, it had not established that such a claim would have been honored by the federal government making corresponding additional contributions to the MSRS. *Id.* at 8–9. The Board also found that Maine had not established that the supplemental contributions were sufficiently linked to federal programs. *Id.* Furthermore, the Board concluded that the State had not demonstrated that there were additional grant funds remaining in the years the supplemental contributions were made. *Id.* at 9.

Finally, the Board determined that even if Maine could demonstrate that the federal government owed the State money as a result of supplemental contributions, allowing the State to offset such debt against the overpayments made by the federal government to the MSRS in fiscal years 1993 and 1994 would be illegal. *Id.* at 9–10. The Board relied on the provisions of the Office of Management and Budget ("OMB") Circular A–87,[2] which the Board concluded "prohibits the shifting of costs among federal programs to overcome fund deficiencies, avoid restrictions imposed by law or grant agreements, 'or for other reasons.'" Decision at 15.

Turning now to the State's challenges to the Board's reasoning, the Court begins by addressing Plaintiff's overarching argument based on substantive fairness. Boiled down, Plaintiff contends that to al-

low the federal government to recover its overpayments in fiscal years 1993 and 1994, while denying the State its proposed offset for federal contributions that should have been made relative to the State's supplemental contributions from 1982 through 1993, is simply unfair. Plaintiff's Motion at 13–16.

Principles of equity and fairness must, and do, play a fundamental role in our system of justice. Indeed the entire body of equitable remedies has its foundation in these principles. But the principle of fairness cannot be the beginning, middle, and end of a legal analysis, especially in a case such as this where the transactions at issue are specifically and intricately governed by regulations and statutes. This is not a contract dispute between two lay people. This is a highly-regulated, complex legal transaction between a state and the federal government. In that light, Plaintiff's reliance on "broad, nontechnical principles of substantive fairness and equity" rings hollow. Plaintiff's Reply Brief at 2 (Docket No. 14).

The State's broad "fairness" argument is particularly unpersuasive in light of the standard of review this Court must maintain under the APA. The State's bald assertion that the denial of its proposed offset is unfair does not demonstrate how the Decision is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law" under the APA. It is true that *procedural* unfairness has been held by courts as a basis to overturn an agency action under the APA. *See, e.g., U.S. v. District Council of New York City and Vicinity of United Bhd. of Carpenters and Joiners of America,* 880 F.Supp. 1051, 1066 (S.D.N.Y.1995) ("[p]rocedurally, an agency's decision can be 'arbitrary and capricious' if it was not the product of the

---

2. OMB Circular No. A–87 exists in various versions. In its Decision, the Board used the version published in 1981, at 46 Fed.Reg. 9548, as opposed to a more recent version published in 1995. Decision at 3 n. 1. Plaintiff has similarly relied on this earlier version. Complaint, Ex. A. The Court will do likewise.

Circular A–87 "establishes principles and standards for determining costs applicable to grants, contracts, and other agreements" with states. OMB Circular A–87 ¶ 1. Circular A–87 applies "to all Federal agencies responsible for administering programs that involve grants ..." to the states. *Id.* ¶ 5(a).

requisite processes"). But Plaintiff is not making an argument based on any procedural inequity.[3] This Court cannot find that the actions of DHHS in this instance were "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law," merely because the State claims that the Decision is unfair.[4]

■ Turning now to Plaintiff's specific challenges to the Decision, the Board began its analysis by concluding that Plaintiff must first establish that Maine had a valid claim to federal funds before an offset could be allowed. Decision at 9. The Board placed the burden on Maine to demonstrate the validity of its claim to federal money. *Id.* Plaintiff argues that the Board's imposition of this burden was erroneous and is grounds for reversal under the APA. As a general matter, it is not unreasonable, let alone arbitrary or capricious, for the Board to require that the State demonstrate why it is entitled, for the purposes of an offset, to nearly $6.5

million[5] in principal and interest of federal funds, especially where the claims are from five to fifteen years old.

In particular, the Board concluded that the State had failed to meet its burden because the State had failed to demonstrate that funds remained in federal educational formula grants in the years that the State made supplemental payments to MSRS.[6] Plaintiff contends that the Board's imposition of this particular burden contravenes 5 U.S.C. § 556(d), which states that "the proponent of a rule or order has the burden of proof" in an administrative hearing. Plaintiff contends that this burden requires that the proponent, in this instance the State, must put forth a *prima facie* case, at which point the burden shifts to the party contesting the proposed order. Plaintiff contends that when it established that the supplemental payments conferred a benefit on the federal government, it had established its *prima facie* case. The Board's requirement of more, Plaintiff contends, is contrary to the APA.

3. Indeed the Decision suggests that Plaintiff received an abundance of procedural "fairness." The Board received written submissions from DHHS and the State, in addition to holding a testimonial hearing on the matter, resulting in an extensive record. The Decision itself is twenty single-spaced pages replete with citations to the record and the law.

4. Plaintiff's "fairness" argument does include several citations to OMB Circular A–87, one of which is worthy of mention here. First, Plaintiff characterizes OMB Circular A–87 Att. A ¶ (A)(1) in a parenthetical comment as standing for the proposition that "federally-assisted programs must bear their fair share of recognized costs." Plaintiff's Motion at 13. This characterization, standing alone, would be insufficient grounds to disturb the Board's Decision out of some larger sense of "fairness." But such a holding is unnecessary when the full text of the cited provision is revealed. OMB Circular A–87 Attachment A ¶ (A)(1), referring in general to the principles set forth in the Circular, states "[t]hey are designed to provide that federally-assisted programs bear their fair share of costs recognized under these principles, *except where restricted or prohibited by law.*" (Emphasis added). Plaintiff may not use this language for authority that principles of "fairness" con-

trol this analysis when the language makes clear that provisions of law supercede such principles.

5. Specifically, the State seeks $2,891,005 in principal and $3,527,658 in interest, for a total of $6,418,662. Plaintiff's Motion at 3.

6. Federal contributions to the MSRS fall into two broad categories: contributions for teachers working under a federal education program and contributions for state employees administering federal noneducational programs. Defendant's Motion at 2. Educational contributions are taken out of annual formula grants given to the states. *Id.* Any portion of such grants that are not spent must be returned to the federal government, and supplemental grants for any given year are unlikely. *Id.* Noneducational contributions are matching contributions from DHHS. A matching contribution is limited only by the amount the state actually contributes to its retirement system. *Id.* In other words, to the extent the State's supplemental contributions were related to educational programs, there may not have been additional federal contributions available if the State had used up its limited, annual grant for other purposes during the years the supplemental contributions were made.

Plaintiff has failed to establish that the burden imposed by the Board was arbitrary or capricious. Plaintiff may have made out a *prima facie* case that the State conferred a benefit on the federal government via its supplemental payments to the MSRS, but that was not the burden reasonably imposed by the Board. Given that Maine was seeking an offset, the Board reasonably placed a burden on the State to "show that the supplemental contributions were allowable charges to federal grant programs." Decision at 9. Even if the Court assumes that the Plaintiff demonstrated that the supplemental payments conferred a benefit, that does not meet the actual *prima facie* requirement that these were "allowable charges to federal grant programs." *Id.* Again, merely because a state confers a benefit on the federal government, the state is not entitled, *ipso facto*, to federal reimbursement.[7]

Plaintiff's argument here fails in two respects. First, Plaintiff has failed to demonstrate that the burden imposed by the Board was contrary to the APA. Furthermore, because Plaintiff has relied on this burden argument, Plaintiff has not produced evidence to undermine the Board's conclusion that the State is not entitled to an offset because the State failed to show there were federal educational program grant funds available. The Board concluded that "Maine moreover failed to demonstrate that it is entitled to reimbursement under any federal education programs that might fund teachers' pensions for the period in which the supplemental contributions were made." Decision at 12. In addition to the fact that the State did not affirmatively establish such an entitlement, the Board based this conclusion on two other factors. First, federal regulations require that all such education grants be used within a limited time period, and that any portion not used should be returned to the federal government. Decision at 13 (citing 34 C.F.R. § 76.709 ("[t]he State shall return to the Federal Government any carryover funds not obligated by the end of the carryover period. . . .")). The State could have established, but did not, that it had excess educational grant funds which it returned to the federal government during some or all of the years that the supplemental contributions were made, such that those funds could be an appropriate source for an offset in this instance.[8] Furthermore,

---

7. The State's retort to this argument is, once again, fairness. The State posits that if the federal government is entitled to recover the benefit it conferred on the State several years ago, in the form of overpayments to the MSRS in fiscal years 1992 and 1993, then the State should also be able to recover the benefit it conferred on the federal government as a result of its supplemental payments to the MSRS between 1982 and 1993. This syllogism fails. The State apparently failed to inform the federal government contemporaneously of its supplemental payments. Accordingly, no additional federal payments were made to the MSRS to correspond to the apparent benefit to the federal government. The fault for the alleged federal "underpayments" between 1982 and 1993 lies with the State, not the federal government. Contrast the overpayments made by the federal government in fiscal years 1992 and 1993 which resulted from erroneous information passed from the State to the federal government regarding the State's actual contributions to the MSRS during that same period. Again, the fault for this overpayment lies with the State, not the federal government.

Despite repeated assertions by Plaintiff to the contrary, merely because the federal government is entitled to recover its overpayments resulting from an error by the State of Maine, it does not follow that the State is entitled to recover federal "underpayments" resulting from another error by the State of Maine. Fairness creates no such requirement. This is not, as Plaintiff repeatedly characterizes it, an effort by the federal government to create a "heads-I-win, tails-you-lose matrix." Plaintiff's Motion at 25, Plaintiff's Reply at 2.

8. Indeed this fact undermines the State's position that the federal government should bear the burden of disproving the State's eligibility for such funds because the federal government controls the information necessary to making such a determination. Plaintiff's Motion at 22. In fact, the State possesses, but apparently did not provide, highly probative evidence on this point. Presumably the State has records that demonstrate whether the

the Board relied on a statement of a Maine State Budget Officer that the State had decided not to submit retroactive claims for educational funds "because we know ... that probably there are no grant funds available in those years." Decision at 9 (quoting Hearing Transcript at 141).[9]

Reviewing the Board's analysis on this point, the Board concluded that the State bears the burden of demonstrating exactly what federal funds it is entitled to before an offset may be allowed. The Board determined that the State failed to meet its burden. Furthermore, federal regulations and admissions of a State Budget Officer offer affirmative evidence that the State is not entitled to any of these grant funds. The Board concluded that the State has not demonstrated that it is entitled to federal funds as a result of the supplemental payments, and an offset, consequently, cannot be permitted.

Plaintiff has failed to demonstrate that any portion of the Board's analysis on this point is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Accordingly, this basis, standing alone, is sufficient grounds to justify the Board's decision under the APA.

The Board did not end its analysis after concluding that the State had failed to demonstrate that it was entitled to federal funds as a result of the supplemental payments. The Board went on to determine that even if the State had established it was entitled to federal educational grant money, it would be improper to offset it against money from a different federal program. Decision at 14–15. "To the extent that the supplemental contributions could have been charged to federal education programs, granting the offset would result in shifting those costs to the non-education federal programs responsible for most of the disallowed overpayment." *Id.* The Board rested this conclusion on OMB Circular A–87, which states:

> Any cost allocable to a particular grant or cost objective under the principles provided for in this Circular may not be shifted to other Federal grant programs to overcome fund deficiencies, avoid restrictions imposed by law or grant agreement, or for other reasons.

OMB Circular A–87 Attachment A ¶ C(2)(b).

Both before the Board and in its Motion, Plaintiff "argued that there was no cost shifting, merely a cancellation of countervailing debts." Decision at 15. The Board disagreed, determining that the requested offset "would result in the entitlement-style grant programs administered by non-education state employees bearing additional costs related to education employees ... which is in clear violation of the Circular prohibition." *Id.* Plaintiff's Motion restates its cancellation-of-countervailing-debts argument. Plaintiff's Motion at 23–24. Indeed, Plaintiff offers Supreme Court authority for the proposition that it would be "absurd[ ]" to make "A pay B when B owes A." *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 18, 116 S.Ct. 286, 289 (1995). The State's reliance on *Strumpf*, a bankruptcy case, is inapposite. While it may be absurd to require A to pay B when B owes A, where A and B are generic debtors and creditors, this logic cannot be blindly applied to a situation such as this, where A is a state, B is the federal government, and the debts apply to different federal programs. Again, Plain-

---

State expended all of its federal education grant money during the relevant period or whether a surplus remained that was returned to the federal government pursuant to 34 C.F.R. § 76.709.

9. Plaintiff's characterization of this statement as the "solitary, slender reed" upon which to

base the Board's Decision is unavailing. Plaintiff's Motion at 22 n. 39. As already indicated, the Board also relied on the requirements of 34 C.F.R. § 76.709 coupled with the State's failure to produce any evidence that it was entitled to federal funds as a result of the supplemental contributions.

tiff's effort to characterize this as a simple financial transaction ignores reality.[10]

With respect to the Board's conclusion that an offset, if otherwise appropriate, would not be allowable under OMB Circular A–87, the State has again failed to demonstrate that this analysis is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Again, this basis, standing alone, is sufficient grounds to justify the Board's decision under the APA.[11]

**B. Interest Rate**

■ In addition to challenging the Board's denial of the State's proposed offset, Plaintiff is challenging for the first time the interest rate charged by DHHS with respect to the federal overpayments to the MSRS in fiscal years 1992 and 1993. Complaint at 11; Plaintiff's Motion at 25. Defendant properly challenges the propriety of considering an issue never presented to DHHS. Defendant's Motion at 27. Plaintiff counters that exceptions to the raise-or-waive rule apply. The Court is persuaded that Plaintiff's failure to raise this issue before DHHS serves as a procedural default.

The Court of Appeals for the First Circuit has set forth three sound policies that form the foundation for the doctrine of procedural default in the context of administrative law. *Massachusetts Dep't of Pub. Welfare v. Secretary of Agric.*, 984 F.2d 514, 523–24 (1st Cir.1993), *cert. denied,* 510 U.S. 822, 114 S.Ct. 81, 126 L.Ed.2d 49 (1993). First, if the issue is raised before, and considered by, the administrative agency, a more "finely tuned" record will be available to the reviewing court. *Id.* at 523. Second, judicial economy is served when an issue is raised and either decided outright or narrowed by the administrative agency, such that judicial review becomes unnecessary or less burdensome. *Id.* "Finally, enforcing procedural default solidifies the agency's autonomy by allowing it the opportunity to monitor its own mistakes and by ensuring that regulated parties do not simply turn to the courts, as a tribunal of first resort." *Id.* While there are "exceptional circumstances" under which a party might be excused for a failure to raise an issue, such an argument must be compelling. *Id.* at 524.

The Court is able to glean from Plaintiff's briefs two arguments as to why it is entitled to an exception to the raise-or-waive rule. First, Plaintiff argues that because it was unaware of the exact interest rate DHHS was charging until after the Board handed down its decision, the State discovered the alleged problem with the interest rate only after the administrative remedies had been exhausted. The State concludes that it should therefore be excused for failing to raise this issue because the State did not become aware of

---

**10.** Plaintiff's intimation that the rules should be relaxed because the State is seeking an offset, as opposed to an outright cash payment, is equally troubling. The Court is aware of no authority to support this proposition. On the contrary, taxpayers must demand that their government, be it state or federal, shall be diligent in ensuring that funds are expended in accordance with applicable law, regardless of whether it is a direct payment or an offset.

**11.** Plaintiff has made an additional argument concerning the appropriations clause of the Constitution. U.S. Const. art. I § 9, cl. 7. Plaintiff contends that the Board's reliance on the appropriations clause in this context is illusory because the clause is derivative—it is implicated only if some other bar to the offset exists. Plaintiff's Motion at 23. Assuming for the moment that Plaintiff's analysis is accurate, it does not provide the Court with grounds to disturb the Board's Decision. First, it is not entirely clear that the Board itself relied on the appropriations clause. A careful reading of the Decision indicates that the Board listed the appropriations clause as one of several authorities relied upon by the DHHS Division of Cost Allocation in its previous decision on this matter. Decision at 10. Second, even if it is conceded that the Board did rely on the appropriations clause, there is no evidence that the Board relied *solely* on the clause. Accordingly, Plaintiff's argument that the clause can be derivative only offers nothing to the analysis.

the problem until the administrative appeal had been complete.

Defendant apparently does not contest that Plaintiff did not learn that the exact rate of interest would be between 14 and 15 percent until after the Board handed down its Decision. However, Defendant points to two letters, predating the Decision, from DHHS to the State indicating that a "Private Consumer Rate" would be applied. Defendant's Motion at 27. Indeed, attached to the Complaint is the original letter from DHHS to the State confirming the results of the audit whereby DHHS discovered its overpayments to the State. Complaint, Ex. B. Specifically, the letter states:

> If payment is not received within 30 days of that date, interest at the current Private Consumer Rate will be assessed, started from the date of this letter, in accordance with Departmental Regulations previously referenced and will be calculated in accordance with Treasury Financial Manual, 1 TFM, Part 6, Section 8025.

*Id.* at 4.

While it may be true that the State was surprised to learn that the Private Consumer Rate was between 14 and 15 percent in this instance, the surprise did not result from any effort on the part of DHHS to hide the rate from the State. Plaintiff was clearly on notice that interest would be charged if the payment was not made within thirty days. Given the large amount of money at issue. Plaintiff could have inquired as to what exactly the Private Consumer Rate would be. Indeed, the capitalization of the phrase "Private Consumer Rate," coupled with the citation to regulations, strongly suggests that such an inquiry might be appropriate and would not be difficult. The Court is unwilling to excuse Plaintiff's failure to raise this issue merely because Plaintiff was not told the exact rate of interest until after the Board

reached its Decision. This is not an "exceptional" or "compelling" argument.

Plaintiff next argues that its failure to raise this issue should be excused because it would have been futile to bring this matter before DHHS. Specifically, Plaintiff relies on *Bowen v. City of New York,* 476 U.S. 467, 106 S.Ct. 2022 (1986), and *Natural Resources Defense Council v. United States Envtl. Protection Agency,* 824 F.2d 1146 (D.C.Cir.1987), for the proposition that futility excuses a failure to raise an issue. First, these two cases cited by Plaintiff address the issue of exhaustion as opposed to the doctrine of administrative waiver. While administrative waiver is a procedural default, exhaustion is an issue of jurisdiction.[12] While in some circumstances the principles underlying these distinct doctrines are synonymous, the Court is not convinced that the holdings of these cases are applicable to the case at bar. *See, e.g., Massachusetts Dep't of Pub. Welfare v. Secretary of Agric.,* 984 F.2d at 523 n. 8; *Eagle Eye Fishing Corp. v. United States Dep't. of Commerce,* 20 F.3d 503, 505 n. 7 (1st Cir.1994).

■ In *Bowen,* a class of plaintiffs sought to challenge a "clandestine [federal] policy against those with mental illness." *Bowen,* 476 U.S. at 475, 106 S.Ct. at 2027. The Supreme Court rejected an exhaustion argument because class members "could not attack a policy they could not be aware existed." *Id.* at 482, 106 S.Ct. 2022. To the extent that principals adopted in exhaustion cases are applicable to waiver cases, the Court rejects Plaintiff's suggestion that the facts in *Bowen* are analogous to the facts in this case. The assessment of interest and the rate at which it is assessed do not reflect a "clandestine" policy on the part of DHHS. Plaintiff's reliance on *Natural Resources Defense Council* is equally unavailing. In *Natural Resources Defense Council,* the

---

12. Because the parties agree that the State achieved a final agency action reviewable by this Court, the Court finds that the State has exhausted its remedies. *See, e.g., Massachusetts Dep't of Pub. Welfare v. Secretary of Agric.,* 984 F.2d at 523 n. 8.

EPA argued that the Council had failed to exhaust its remedy because it had not participated in the administrative proceedings below. *Natural Resources Defense Council,* 824 F.2d at 170. The Court of Appeals for the District of Columbia Circuit rejected this exhaustion argument in large part because another entity had raised the issue below and the court had the benefit of a detailed administrative record on the matter. *Id.* at 171. Again, to the extent that principles adopted in exhaustion cases are applicable to waiver cases, the Court rejects Plaintiff's argument that the holding in *Natural Resources Defense Council* is compelling authority in this case. The fact that another entity had raised the issue below, and created an administrative record in *Natural Resources Defense Council,* vitiates the concerns reflected in the three policies that underlie the doctrine of administrative default. *See Massachusetts Dep't of Pub. Welfare v. Secretary of Agric.,* 984 F.2d at 523–24. Granting an exception to the doctrine of administrative default in a case like *Natural Resources Defense Council* would, therefore, be entirely appropriate. But Plaintiff in this case cannot point to an existing record on the issue of interest rates. The analogy, therefore, fails.[13]

Because Plaintiff has not raised the issue of interest rates below, the Court finds that Plaintiff has waived this issue and the Court will not consider the merits of Plaintiff's claim on this point, consistent with the strict application of the raise-or-waive doctrine of administrative default. *See Massachusetts Dep't of Pub. Welfare v. Secretary of Agric.,* 984 F.2d at 523–24; *Eagle Eye Fishing Corp. v. United States Dep't. of Commerce,* 20 F.3d at 503 (1st Cir.1994).

---

13. Both parties have gone to great lengths to direct the Court's attention to *West Virginia v. United States Dep't of Health & Human Serv.,* No. 2:97–0245 (S.D.W.Va. March 31, 1999) including a supplemental brief from each side (Docket Nos. 18, 20). The First Circuit's Local Rule 36.2(b)(6) states that unpublished opinions may be cited only in related cases.

## IV. CONCLUSION

Accordingly, it is *ORDERED* that Plaintiff's Motion for Summary Judgment be, and it is hereby, *DENIED.* Additionally, it is further *ORDERED* that Defendant's Motion for Summary Judgment be, and it is hereby, *GRANTED.*

This rule is applicable to litigation in this Court. *Bachelder v. Communications Satellite Corp.,* 837 F.2d 519, 523 n. 5 (1st Cir.1988); *Merrill Lynch, Pierce, Fenner & Smith v. Bishop,* 839 F.Supp. 68, 73 n. 3 (D.Me.1993). Accordingly, despite the similar issues addressed in the West Virginia case, this Court is precluded from relying on it.